78 So.2d 522.

**Lloyd ROUSSE**

**v.**

**The HOME INSURANCE COMPANY.**

**No. 41707.**

Feb. 14, 1955.

Deutsch, Kerrigan & Stiles, New Orleans, Brunswick G. Deutsch, Lansing L. Mitchell, Nigel E. Rafferty, New Orleans, of counsel, for appellant.

Reed, Reed & Reed, New Orleans, Floyd J. Reed, Corwin B. Reed, New Orleans, of counsel, for plaintiff-appellee.

HAMITER, Justice.

A policy of marine insurance written by the Home Insurance Company insured Lloyd Rousse's wooden crew boat, the Esso, against the adventures and perils of the harbors, bays, sounds, seas and rivers. The contract specifically excepted from the coverage, among others, all claims arising from "rottenness, inherent defects, and other unseaworthiness."

While the policy was in full force and effect the mentioned vessel sank in the Mississippi River below New Orleans, and it was never raised so as to permit a determination of the specific cause of the disaster. Thereafter, this suit was brought by such owner, he alleging a total loss of the insured property and demanding judgment against the insurer for the sum of $3,000, the boat's value.

Resisting the demand, the defendant took in the trial court, and it now takes, the po-

sition (quoting from the brief of its counsel) that "the Esso was not lost as the result of any of the specified marine perils insured against, but because of her unseaworthy condition in breach of the policy's continuing warranty of seaworthiness; and, further, that appellee failed to comply with the condition of the policy (the so-called 'sue and labor' clause) obligating the assured to make all reasonable exertions necessary to safeguard and recover the vessel to prevent her from becoming a total loss."

The district judge rendered a judgment in favor of plaintiff in accordance with his prayer, and the defendant is appealing.

■■■ In a case of this nature, where the specific cause of the loss is unknown and not determinable and the contract insures against only perils of the seas, etc., the matter of burden of proof (along with the attending presumptions) becomes important. In this connection the rule seemingly obtaining in this state, and being the one apparently supported by the weight of authority in other jurisdictions, is that under the mentioned circumstances there exists a presumption that the loss was due to the unseaworthiness of the vessel. But the insured has the opportunity of rebutting this presumption. And if he succeeds in establishing that the boat was in a seaworthy condition shortly before the sinking, shows a possible cause for the loss that comes within the insurance coverage, and no proof of fraud is made, he will have discharged the burden which he carries and there arises the counter presumption that the unexplained sinking resulted from a peril insured against. Marcy v. Sun Mutual Insurance Company, 11 La.Ann. 748, Marcy v. Sun Ins. Co., 14 La.Ann. 264, Parker v. Union Insurance Company, 15 La.Ann. 688, Hillman Transportation Company v Home Insurance Company of New York, 268 Pa. 547, 112 A. 108, Boston Insurance Company v. Dehydrating Process Company, 1 Cir., 204 F.2d 441. See also 31 A.L.R. 1378.

■■ Mindful of this rule, the applicability and correctness of which neither litigant disputes, we now consider the evidence adduced. In July, 1952, the vessel in question (28 feet long and seven feet wide) having previously been stolen and damaged, plaintiff sent it for repairs to the Oulliber Boat Works located on the Industrial Canal in the City of New Orleans. Undertaken there sometime during a period of some four months was a reconditioning of the hull, which required the boat's removal from the water and being placed on the ways; and this consisted primarily of a recaulking and retightening of the bottom. According to the foreman of that organization there were no planks broken or worm eaten, and after the repairs were completed he gave the boat a water test and ascertained it to be tight. Plaintiff and one of the mechanics also tested it during the early part of December, 1952, and they found the hull in good condition.

Shortly thereafter, specifically on December 12, 1952, a marine surveyor employed by defendant (one Kirby Roberts) made an inspection of the vessel, while it was afloat at the shipyards, for the purpose of determining whether the instant policy should be issued. The following testimony which he gave discloses his conclusion as to its seaworthiness:

"Q. What was the condition of the part of the hull that you could see? A. Well, it was pretty hard to determine. However, it looked pretty good in there. I didn't get in there with a knife and screw driver and pry around in the framing or anything.

"Q. Well, generally what was your opinion of the condition of the boat at that time? A. I would say it was in fair condition considering its age and its use over a period of years.

\* \* \* \* \* \*

"By the Court:

"Q. You found this boat to be seaworthy in your estimate? A. As far as I could tell, your honor, without dry-docking or opening it up or removing any of the sheeting or drilling holes in the planking, yes, sir.

"Q. Did you make any request to have this boat dry-docked? A. No, sir.

"Q. Was there any doubt in your mind when you examined the boat? Did you have any doubt that the boat was seaworthy? A. No, I had no doubt.

"Q. From what you saw? A. Yes, and from what he told me.

"Q. You don't go by what anybody tells you? A. That's right.

"Q. You look at it? A. That's right, sir.

"Q. And you made no request to have this boat dry-docked? A. No, sir."

Mr. Roberts understood plaintiff to say at the time of the inspection that some new planking had been put in the boat while being repaired during the previous four or five months. However, the latter, according to his testimony, stated to the surveyor that new planks were placed on the hull in 1951 and that they were in first class shape.

Early in the morning of December 19, 1952 Louis Rousse, plaintiff's brother, went to the Oulliber Boat Works for the purpose of piloting the Esso to Buras, Louisiana. An inspection of the bilge disclosed that no water was there, and a short test run satisfied him that the vessel was operating on an even keel "and everything was working all right."

Departing on the trip about 8:30 o'clock of such morning he had occasion to go through the Industrial Canal Locks, and while therein he again noticed that the bilge was free of water. About an hour later the boat left the Industrial Canal, entered

the Mississippi River, and proceeded at half speed towards its destination, Buras.

As the Esso neared Quarantine Anchorage, in the vicinity of Belle Chasse, the pilot reduced the speed for the purpose of passing several ships there lying at anchor. After the passing, a half speed was resumed and "the boat began to plane again". Shortly thereafter, while much driftwood floated in the river, the pilot noticed a particular scraping along the entire bottom of the boat. Again he slowed momentarily to ascertain what caused the incident; however, no object surfaced.

About three-quarters of a mile farther down river, and while opposite the Okonite plant, the Esso's engine suddenly stopped, and water was observed coming into the hull. This occurred approximately two and one-half hours after the commencement of the trip. The two bilge pumps were unable to keep out the fast entering water, and all attempts to start the engine were unsuccessful. Thereupon, the pilot paddled the boat to the shore, moored it with a rope to a pipe and a tree, and left to report the difficulty to plaintiff.

Later that afternoon the Rousse brothers ineffectually sought to bail the vessel. Then, with only small portions of the deck house and sterm remaining above the surface of the water, they went to Venice (south of Buras) with the view of renting two air tanks to be used in contemplated raising operations. But such tanks were in use and, hence, not available to them.

The next day plaintiff reported the sinking to the defendant. This resulted in the latter's marine surveyor and the representative of a salvage company making a trip to and an inspection of the Esso. Later, the salvor representative informed defendant's surveyor and also plaintiff that its salvaging would cost $800. But this was not undertaken, and the vessel was never raised.

As we appreciate the evidence contained in the record plaintiff has discharged his burden of proving that the Esso was seaworthy shortly before the mishap. To such effect is his testimony and that of his brother, and it is corroborated even by witnesses appearing for defendant. For example, that the hull had no loose or faulty fastenings, as defendant seems to suggest it had and was the reason for the loss, is clearly shown by the testimony of the shipyard foreman whom the defendant called. He testified that the previously pulled fastenings had been fixed, caulking had been performed where needed, and thereafter the hull was given a water test and found to be tight.

Moreover, it has been shown that very probably the scraping on the boat's bottom, which was noticed by plaintiff's brother after passing Quarantine Anchorage, led to the ultimate sinking. According to an independent marine surveyor, produced by defendant as a witness, there is a lot of driftwood in the Mississippi River during the month of December, some of which

floats below the surface of the water and is not apparent; and a piece of it could be of a nature (containing protruding nails) as would pull out caulking from the hull. In this connection he stated: "If it had been scraping immediately prior to the sinking or if it struck something immediately prior to the discovery of water in the hull, I would say that that was probably the primary cause of the entrance of water into the hull."

And plaintiff having discharged the burden which was his, there exists, under the above stated rule, a presumption (not overcome by this defendant) that the unexplained sinking was caused by a peril insured against.

■ Without merit is defendant's contention that plaintiff cannot recover because he failed to make "all reasonable exertions" for the recovery of the Esso as is required by the "sue and labor" clause of the contract which recites: "And in case of any loss or misfortune, it shall be lawful and necessary to and for the insured * * * to give the Insurers prompt notice of the disaster, and a failure to do so will render the Insurers free from any liability for loss or damage under this Policy; to sue, labor and travel for, and to make all reasonable exertions in and about the defense, safeguard and recovery of the said vessel, or any part thereof, without prejudice to this insurance * * *."

As pointed out above plaintiff, on the day of the sinking, sought to prevent loss through attempts to bail the boat and to obtain air tanks for raising it. And when these efforts proved fruitless he, during the next day, notified appellant. Further, on learning of the cost of salvaging operations, he unsuccessfully tried to borrow the $800 from several banks and other lending institutions and from relatives. Then, the funds not having been obtainable, he informed appellant that he would be unable to have the salvaging performed. His undertakings, we think, satisfied the policy provisions invoked and relied on by defendant.

For the reasons assigned the judgment appealed from is affirmed.