### BUESCHING v. AETNA INSURANCE CO., et al.
### No. 61578.

Civil Court of Record, Duval County.

June 19, 1959.

Joseph C. Black, Jacksonville, for plaintiff.

Boggs, Blalock & Holbrook, Jacksonville, for defendant Aetna Insurance Co.

McCarthy, Lane & Adams, Jacksonville, for defendant Springfield Atlantic Bank.

WILLIAM H. MANESS, Acting Judge.

This cause is before the court upon a motion for a summary judgment, filed by defendant Aetna Insurance Co. ("the insurance company" hereafter) on April 1, 1959. After the filing of the motion the plaintiff was granted leave to file a second amended complaint, which the insurance company answered on May 25, 1959. The insurance company filed a brief in support of its motion for summary judgment and the defendant Springfield Atlantic Bank of Jacksonville ("the bank" hereafter) filed its brief opposing the motion. After the plaintiff filed a brief the insurance company filed a reply brief to the briefs of plaintiff and the bank. The court has not heard oral arguments but has read and considered each of the briefs abovementioned, the entire record herein, including all the pleadings, affidavits, and other documents in the file. If there is no genuine issue as to any material fact found from the pleadings, affidavits, and other documents herein, the motion should be granted. If the contrary is true, the motion should be denied.

To some extent, many facts are undisputed. The defendant insurance company, admits the issuance of marine insurance policy no. Y-71-88-18 (yacht form) to the plaintiff, insuring plaintiff's 1949 16 foot Garwood Inboard 92 h.p. boat, described in the policy, against certain perils and losses therein specified for the period from September 16, 1957 to March 16, 1959. The defendant bank was named in a loss payable clause in the policy.

Thereafter, for approximately one year and ten days later, plaintiff used and operated the boat, kept it in the water when not in use, and docked it at his boat dock. On the night of September 25, 1958, at approximately 9:30 P.M., he saw his boat moored at his dock and at that time it appeared to be in a normal condition, riding high and dry, on an even keel, and not loaded. The boat was not seen again until approximately 7:30 A.M. the following morning when he discovered it had sunk during the night. As a result of the sinking, he claims that he has suffered a loss within the coverage of said policy.

After the sinking was discovered, one Pembroke Huckins, president of Southern Marine Co. of Jacksonville, was called to raise the boat to the surface, and the boat was raised, placed on a barge, and taken to that company's repair yard in Jacksonville.

While the foregoing facts are undisputed, the affidavits of plaintiff Buesching, Pembroke Huckins, and one Jack Ervin, differ in certain respects. Plaintiff claims that an agent of the defendant insurance company advised him—"it can definitely be substantiated that the worm holes were the approximate cause of the sinking." Pembroke Huckins, a qualified marine expert, asserts—"there was no latent defect in the bailer", but that it did not fit the "through-hull fitting" because a connection had been improvised in a "poor and unacceptable" manner which left the connection "prone to leak". He further asserted that just the vibration of the engine could cause this type of connection to leak and that, while there were some worm holes in the hull they were so small that the amount of water entering the boat through these worm holes was negligible and did not cause the sinking. In the opinion of Huckins, the sinking was caused by leakage of water from the rubber hose within the rubber hose connection of the bailer with the through-hull fitting. These assertions constitute the only attempts to explain what actually caused plaintiff's boat to sink.

Plaintiff further asserts in his affidavit that less than four weeks prior to the sinking the boat had been repaired and refinished by professional repairmen (Jack Ervin, American Marine Storage & Repair Co.) who did not report the discovery of any defects in the hull, machinery, or fittings which might cause it to sink, or which might affect its seaworthiness, and that the automatic bailer had been repaired in plaintiff's presence less than two months prior to the sinking, and that the repairmen reported no apparent defect in the automatic bailer, or its fittings, or in any other part of the hull, machinery, or fittings, which could, or might cause the boat to sink. These assertions are corroborated in part, and disputed in part, by the affidavit of Jack Ervin who asserts that, in the latter part of July of 1958, plaintiff brought his boat to his place of business and employed them to install a used engine, for which they were paid their charges of $25 on August 11, 1958; Ervin further asserts that, while this work was being done, plaintiff was given permission and did paint the hull of the boat at their place but that, about a month later, plaintiff returned and employed Ervin to scrape the barnacles off the hull and paint the hull; that this work was done in a careful and workmanlike manner, all worm holes and screw head holes which were exposed were filled with putty and a coat of enamel paint was applied to the hull. At a still later time, Ervin says plaintiff brought his boat back in a sinking condition with water up to the floor boards, at which time he was advised by Ervin that the vent in his automatic bailer was probably clogged up and suggested that the vent be cleaned. This plaintiff did with a bristle from a

wire brush. At that time, Ervin says he also told plaintiff that when the vent hole in the automatic bailer is clogged up it causes the bailer to back-siphon water into the boat instead of discharging water, and recommended the installation of an "automatic cut-off type bailer", which is so constructed as to prevent any such back-siphon, the cost of which was only $12.50. Plaintiff declined to purchase this type and, according to Ervin, performed his own repairs to the bailer then in the boat. Finally, Ervin (who, no doubt, can qualify as an expert witness) asserts—"The type of bailer Mr. Buesching had on his boat was such that if he had it moored to the dock with the current flowing against its stern, water was likely to enter the hull through the automatic bailer."

It is well settled that marine insurance policies should be interpreted in accordance with principles of maritime law. See U. S. Fire Ins. Co. v. Gulf State Marine and Mining Co., Fifth Circuit Court of Appeals, January 9, 1959, 1959 A.M.C. 397. The amended complaint predicates plaintiff's right to recover under the policy for the loss sustained on the theory that the sinking was due to a peril of the sea or inland waters, or a latent defect, or the negligence of a repairer in failing to properly repair the worm holes and/or automatic bailer. It is undisputed that any, and all of these alleged causes are within the terms of the policy. However, even though not specifically set forth in the policy, the owner (plaintiff) of a boat impliedly warrants its seaworthiness and, if the sinking was due to unseaworthiness, there can be no recovery. For the purpose of the pending motion, the seaworthiness of plaintiff's boat—which is not denied—is deemed admitted in construing the facts most strongly against the party seeking the summary judgment. Furthermore, no defense of unseaworthiness is asserted.

In support of its motion for summary judgment the insurance company relies primarily upon the theory that the language of the "Perils" clause, to-wit—"Touching the adventures and perils . . . they are of the seas, rivers, lakes, and/or other inland waters . . . and of other perils, losses and misfortunes that shall come to the hurt, detriment or damage of said yacht or any part thereof . . ." does not embrace a sinking due to ordinary perils which every boat must encounter but only sinkings due to extraordinary occurrences, such as stress of weather, winds and waves, lightning, tempest, rocks, etc. There is considerable support for this construction. See Union Marine Insurance Co. v. Stone & Co., 1927 A.M.C. 7, 9, 15 Fed. 2d 937, 939; also Hazard v. New England Marine Ins. Co., 33 U. S. 557.

However, the trend of more recent cases puts the burden upon the insurer to prove that the boat did not sink as a result of a marine peril where the assured establishes proof of good care and sea-

worthiness. These cases, in effect, fasten liability for the loss on the insurer for unexplained sinkings and consequent loss—"by some extraordinary, although unknown and unascertainable, peril of the sea." See Boston Ins. Co. v. Dehydrating Process Co., First Circuit Court of Appeals, May 21, 1953, 1953 A.M.C. 1364; and, Glen Falls Ins. Co. v. Long, et al., Supreme Court of Appeals, Virginia, September 10, 1953, 1953 A.M.C. 1841, and cases therein cited.

In the case at bar there is a genuine issue as to material facts raised by the application of the foregoing authorities. Under these, a presumption of unseaworthiness arises from the fact of the sinking, which is undisputed. But upon a showing that plaintiff took good care of his boat, as a jury could find from the affidavits herein, the presumption of unseaworthiness is overcome and a counter presumption arises that the sinking was due to an "unknown and unascertainable peril of the sea."

But, the defendant-insurer contends, the cause of the sinking is known and shown to be solely due to the leaky connection of the bailer and, therefore, the latter presumption disappears. That interpretation of the facts cannot sustain the motion because of the freedom of the jury to find that the sinking was due either to a leaky and defective bailer *or* an unknown peril of the sea.

Furthermore, under the facts set forth in the affidavits herein, there is also a genuine issue as to the seaworthiness of the boat if the jury believe Ervin's testimony regarding the "clogged bailer", his assertion that a different type should be installed, and the previous "sinking condition" of the boat; all of which *may* be offset by his view that the current could set up a back-siphon, the testimony of plaintiff as to his satisfactory use of the bailer for at least a few weeks before the sudden sinking, and the care the assured says he took of the boat. And, even if the jury should find that the bailer itself, or its installation, was unseaworthy or improper, the jury would be free to infer from the facts set forth herein that such was due to the negligence of a repairer or a latent defect, either of which would support a recovery by plaintiff.

The question of plaintiff's right to defeat the motion on the basis of a "latent defect" is made moot by the foregoing but this court adopts the view that there is a genuine issue as to whether or not the unusual and improper functioning of a bailer, free from any mechanical or structural defects, is in and of itself a latent defect when such "unusual and improper functioning" was not and could not be anticipated by the owner.

Therefore, this court holds that there is a genuine issue as to the cause of the sinking of the insured's boat and that, from the facts described by the affidavits herein, a jury would be entitled to infer, among other things, that the sinking was due to any one, or more, of the following causes—(1) An unknown and unascertainable peril of the sea. (2) Current flowing against the stern of the boat in an unusual manner so as to set up a "back-siphon" and permit water to enter the hull through the automatic bailer. (3) A latent defect in the automatic bailer. (4) The malfunctioning of an otherwise seaworthy bailer. (5) A leaky bailer resulting from negligent repair or failure to repair. (6) A leaky or defective bailer of which plaintiff knew or was charged with knowledge. (7) General unseaworthiness.

The motion for a summary judgment is therefore denied.