The DARIEN BANK, Plaintiff-Appellee,

v.

The TRAVELERS INDEMNITY COMPANY, Defendant-Appellant.

Jack GORE, Plaintiff-Appellee,

v.

The TRAVELERS INDEMNITY COMPANY, Defendant-Appellant.

No. 80–7648.

United States Court of Appeals,
Fifth Circuit.
Unit B

Aug. 31, 1981.

Rehearing and Rehearing En Banc
Denied Oct. 6, 1981.

Edwin D. Robb, Jr., Walter C. Hartridge, Savannah, Ga., for defendant-appellant.

Charles M. Jones, Hinesville, Ga., for plaintiffs-appellees.

Before HILL, FAY and HENDERSON, Circuit Judges.

PER CURIAM:

Appellant, Travelers Indemnity Company, appeals the District Court's denial of its motions for a directed verdict and for a judgment notwithstanding the verdict in this consolidated action to recover under a marine insurance policy for the loss of the vessel STONEFIELD LADY. Finding that the appellee, as plaintiff, not only presented a prima facie case but also met his burden of proof, we affirm.

I.

This appeal arose out of the loss in the Gulf Stream of a 73 foot shrimp boat, the STONEFIELD LADY, which was owned by appellee Gore, mortgaged to appellee bank and insured by appellant. When discovered by the Coast Guard off Cape Hatteras, North Carolina, on June 27, 1978, the vessel was in a semi-submerged condition, bow vertically down, anchor out, with only three feet of stern above water. Since the Coast Guard suspected that the vessel contained contraband they airlifted a Navy Diving Team to the site and investigated the vessel. The team found no evidence of contraband in the vessel but they did note that the ship's wheel had been lashed in two places, that there were few personal belongings within, that the vessel's rigging was normal, that one portable pump was rigged on deck and the hatches open, that there were no openings through the hull valvefittings or in the hull itself which would allow ingress of sea water. *Record*, at 146–54. However, the diver also testi-

fied, in deposition, that it appeared that someone had unsuccessfully attempted to hole the hull in the forward compartment.[1] Shortly after the vessel was taken in tow it completely sank in calm seas. The parties stipulated that the vessel "was lost by sinking". The whereabouts of the crew or their fate remains unknown.

Several weeks prior to the loss of the STONEFIELD LADY, police seized fifteen tons of marijuana from one of appellee's other shrimp boats, the LITTLE HORNET. Appellee received immunity from prosecution in consideration for testimony against his co-conspirators in that case as well as in regard to the STONEFIELD LADY. No prosecution was instituted in the latter instance, yet appellant maintains that the parallels between the two vessel's activities indicate that the STONEFIELD LADY was scuttled when this criminal scheme was foiled by the authorities.

In the spring of 1978, appellee a Georgia resident, owned four shrimp boats, the LITTLE WASP, LITTLE HORNET, WINYAH BAY and STONEFIELD LADY which were outfitted mainly in Fort Myers, Florida for fishing in the Gulf of Mexico. Testimony indicates that appellee approached a Georgia neighbor, Jack D'Antignac, with a plan for using appellee's pier for off-loading marijuana after importing it from Colombia in the LITTLE HORNET. They agreed to this scheme and shortly thereafter the boat was outfitted in Fort Myers with a long range single-side-band radio and a navigational aid, the Loran A, to supplement the LITTLE HORNET's existing navigational system. Although a soon to be phaseout model of radio navigation equipment, Loran A could be used to navigate at distances further from the United States than the newer system, Loran C, i. e. to Colombia. This was due to the dearth of Loran C stations throughout the Caribbean at that time. However, there are other aspects to such a purchase.

The Loran A was in some instances more accurate than Loran C, in areas of mutual coverage, due to problems in the new system. Further, appellee testified that differences in the placement of Loran lines on charts were significant to his fishing activities. Since shrimping involves fishing off small "table top" formations on the Gulf floor, precise navigation is essential and resort to two navigational aids, where possible, would be beneficial. *Record* at 15–20, 63–64.

The LITTLE HORNET, LITTLE WASP and WINYAH BAY all had Loran A's on them. The newly built STONEFIELD LADY only had the Loran C installed, but soon after the LITTLE HORNET received her second set of Loran A,[2] the STONEFIELD LADY was also outfitted with a Loran A and a single-side-band radio. The other two shrimp boats did not receive such radios.[3]

Appellee relieved the regular captain and crew of the LITTLE HORNET and turned that vessel over to D'Antignac for the smuggling run. Before leaving for Colombia the boat took on small quantities of ice and large quantities of fuel. Similarly, appellee relieved his son Tom as captain of the

---

1. Lieutenant Foley stated:

   . . . I believe in the forward starboard side of the bow compartment, there was some structural damage which appeared to be—well, it appeared that someone had tried to ship [sic] away a hole

   Q. From which side of the hull; the outside or the inside?

   A. From the inside.

   Q. If you will, describe that in as much detail as you can.

   A. I would say the diameter of the hole was approximately 12 to 14 inches. It was pretty much a circle with the edges being rough, and it seemed like it penetrated one or two layers of the hull, and terminated against what appeared to be some wire mesh.

   Q. Did the hole, as you described it, go all the way through the bulkhead or the wall of the boat?

   A. No, it did not.

   *Record* at 152–53.

2. Appellee testified that the first set had been giving him problems. *Record* at 63. The sets on the LITTLE WASP and WINYAH BAY were in good working order. *Id.* at 64.

3. Appellee did testify that "[t]he LITTLE WASP had a comparable radio to the single-side-band already." *Record* at 65.

STONEFIELD LADY, as well as the crew, and put them on the WINYAH BAY. He testified that he did this to increase production on the WINYAH BAY and with the intent that he would captain the STONEFIELD LADY himself to increase its production. *Record* at 4–6. On cross, appellee admitted that the STONEFIELD LADY, under Tom Gore, had out produced all the other boats, but he also noted that he had made one trip on it himself that season. *Record* at 55–56.

The STONEFIELD LADY was also provisioned with a relatively large quantity of fuel and small quantity of ice prior to departing Fort Myers on May 26, 1978. Appellee attempted to explain these facts as relevant to the larger fuel and ice keeping capacity of the STONEFIELD LADY, compared to his other boats, and the need to prevent condensation rusting of fuel tanks by keeping the tanks topped off on long shrimping trips. *Record* at 84–89. The STONEFIELD LADY departed Fort Myers a week after the LITTLE HORNET and was discovered semi-submerged in the Gulf Stream seventeen days after the LITTLE HORNET was seized. During that time the appellee testified that he had no contact with the STONEFIELD LADY or its crew and that he did not know how it had come to be in that condition over 1,000 miles from its port of departure.

The vessel was covered by a specifically enumerated Marine Perils Policy for $160,-000 with appellee bank as a loss payee. The quaint perils clause reads as follows:

PERILS Touching the Adventures and Perils which we, the said Underwriters, are contented to bear and take upon us, they are of the Seas, Men-of-War, Fire, Lightning, Earthquake, Enemies, Pirates, Rovers, Assailing Thieves, Jettisons, Princes and Peoples, of what nation, condition or quality soever, Barratry of the Masters and Mariners and of all other like Perils, Losses and Misfortunes that have or shall come to the Hurt, Detriment or Damage of the said Vessel, etc., or any part thereof; excepting, however, such of the foregoing Perils as may be excluded by provisions elsewhere in the Policy or by endorsement. And in case of any Loss or Misfortune, it shall be lawful and necessary for the Assured, their Factors, Servants and Assigns, to sue, labor and travel for, in, and about the Defense, Safeguard and Recovery of the said Vessel, etc., or any part thereof, without prejudice to this Insurance, to the Charges whereof the Underwriters will contribute their proportion as provided below. And it is expressly declared and agreed that no acts of the Underwriters or Assured in recovering, saving or preserving the property insured shall be considered as a waiver or acceptance of abandonment.

When the insurer's agent learned of the discovery of the STONEFIELD LADY, he attempted to contact the appellee in regards to adjusting the claim and the possible salvage of the vessel. Appellee referred all inquires, including those of the Coast Guard, to his attorney.[4] No salvage attempt was made by any party to this litigation. All insurance loss claims were rejected by the appellant.

Also relevant to this action is whether a full crew was on board the STONEFIELD LADY when she departed Fort Myers.[5] Appellee testified that he hired a Jim Gentile to captain the STONEFIELD LADY and instructed him to hire a crew of two

---

4. *Appellant attempts to relate this to the criminal investigation of the LITTLE HORNET since appellee's attorney represented him in that matter as well. Appellee, on the other hand, testified that he had been previously dissatisfied with the agent's handling of a previous claim of damage to one of his boats and had resolved only to deal with the agent through an attorney. Record at 29.*

5. *The policy contained an express warranty of seaworthiness as follows:*

WARRANTY OF SEAWORTHINESS. Warranted that at the inception of this Policy the vessel shall be in a seaworthy condition and, thereafter, during the currency of this Policy, the Assured shall exercise due diligence to keep the Vessel seaworthy, and in all respects fit, tight and properly manned, equipped and supplied.

and fish off the Louisiana and Alabama coasts. Appellee related that he had known this individual for several years as a result of fishing in the same vicinity and conversing on ship to ship radio but had never actually met him. However, appellee stated that Gentile came to him in search of a job while appellee was working on the STONEFIELD LADY and that appellee tested his knowledge of rigging and maneuvering prior to hiring him as captain. Appellee further testified that it was customary for the captain to hire his own crew and that appellee did not meet any member of the STONEFIELD LADY'S crew before she sailed. *Record* at 8–12, 26–28.

Appellant, in response, put on evidence of discrepancies between appellee's description of Gentile and the description of others who apparently might have dealt with this captain. Further, various knowledgeable people in the area testified for appellant that they had never heard of a Jim Gentile as captain of a shrimpboat. *Record* at 70, 72, 94–96, 107–08. However, some of these witnesses had not heard of Tom Gore, appellee's son, as a shrimpboat captain either. *Record* at 96.

## II.

■ We are principally concerned with whether the evidence presented was sufficient to state a prima facie case, to reach the jury and to support a verdict for the plaintiff. Under a specific perils insurance policy the burden of proving a loss by a peril insured against is on the insured. *S. Felicione & Sons Fish Co. v. Citizens Casualty Co. of N.Y.*, 430 F.2d 136, 138 (5th Cir. 1970), *cert. denied*, 401 U.S. 939, 91 S.Ct. 936, 28 L.Ed.2d 219 (1971). However, the standard for review of motions for directed verdict and for judgment notwithstanding the verdict prevents us from reaching determinations regarding the credibility of testimony. As stated in this Court's leading opinion, *Boeing Company v. Shipman*, 411 F.2d 365 (5th Cir. 1969) (*en banc*);

> [t]he Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the

light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motion is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Id.* at 374–75.

■ Although not entirely clear, it appears that the arguments at trial centered upon whether the evidence adduced was sufficient to prove loss by a peril of the sea, barratry or scuttling. Barratry of the master is defined "as an act committed by the master or mariners of a ship for some unlawful or fraudulent purpose, contrary to their duty to the owners, whereby the latter sustain an injury." *Fishing Fleet, Inc. v. Trident Ins. Co., Ltd.*, 598 F.2d 925, 927 (5th Cir. 1979) (quoting *Marcardier v. Chesapeake Ins. Co.*, 12 U.S. (8 Cranch) 39, 49, 3 L.Ed. 48 (1814)). Scuttling, of course, requires the sinking of a vessel with the complicity, knowledge, consent or participation of the owner. *See Northwestern Mutual Life Ins. Co. v. Linard*, 498 F.2d 556, 560–62 (2nd Cir. 1979). *See also Fishing Fleet, Inc. v. Trident Ins. Co., Ltd.*, 598 F.2d at 929.

**[4]** Loss by peril of the sea certainly contemplates, as appellant contends, "... perils which are peculiar to the sea, and which are of an extraordinary nature or arise from irresistable force or overwhelming power, and which cannot be guarded against by the ordinary exertions of human skill and prudence." *Reisman v. New Hampshire Fire Ins. Co.*, 312 F.2d 17, 19 (5th Cir. 1963) (quoting *R. T. Jones Lumber Co., Inc. v. Roen Steamship Co.*, 270 F.2d 456, 458 (2nd Cir. 1959)). However, as stated by Judge Garza, it also embraces:

> ... all kinds of marine casualties which are of the sea as distinguished from merely being on the sea, and which are of a fortuitous nature and not the inevitable result of the action of the elements on the fabric of the vessel or its cargo.

> \*　\*　\*　\*　\*　\*

The coverage is against casualties which may occur, not consequences which must occur; the peril must result from the violent action of the elements, as distinguished from their natural, silent influence on the fabric of the vessel; loss or damage resulting from the ordinary and inevitable action of the winds and waves, such as natural decay and wear and tear, is excluded. Moreover it is not necessary that there should be the action of the sea, wind, or waves, violent or otherwise, to cause a peril of the sea, but an accidental occurrence, peculiar to the sea, not happening through design, is sufficient.

"The rule has been laid down that a policy insuring against 'perils of the sea' covers only extraordinary risks or occurrences, but other cases hold that it is not limited to extraordinary perils, and covers all instances of marine casualties due to the fortuitous action of the seas. In any event the peril need not be extraordinary in the sense of being catastrophic or arising from causes which are uncommon and could not be reasonably anticipated. Furthermore, whether or not an occur-

rence constitutes an extraordinary risk so as to be a peril of the sea is not of itself an absolute and unvarying thing, but is dependent on the circumstances of the case and the character of the vessel insured. In considering what is and what is not a peril of the sea, the question is whether the loss arose from injury from without or from weakness within. To make insurer liable the injury must have been occasioned by a storm or accident that would injure a seaworthy vessel."

*United States Nat. Bank of Galveston v. Maryland Nat. Ins. Co.*, 218 F.Supp. 257, 249 (S.D. Tex. 1963) (quoting 45 C.J.S. *Insurance* § 854). For example, mere swells may or may not be enough based upon the circumstances of the case.[6]

Taking the alleged loss by peril of the sea first, we note that there is little evidence presented. It is stipulated that the vessel sank at sea, but without more this does not appear to be a fatal admission. *See By's Chartering Service, Inc. v. Interstate Ins. Co.*, 524 F.2d 1045, 1047 (1st Cir. 1975). There is no evidence of a storm ravaged superstructure, *see Continental Insurance Co. v. Hersent Offshores, Inc.*, 567 F.2d 533, 534–35 (2nd Cir. 1977), or of "the cruel sea working on a troubled hull" resulting in the loss. *See Tropical Marine Products, Inc. v. Birmingham Fire Ins. Co. of Pa.*, 247 F.2d 116, 122 (5th Cir.), *cert. denied*, 355 U.S. 903, 78 S.Ct. 331, 2 L.Ed.2d 260 (1957). Nor was there evidence adduced of natural decay or of a leak occasioned by wear and tear on this relatively new shrimpboat. *See Reisman v. New Hampshire Fire Ins. Co.*, 312 F.2d 17, 18–19 (5th Cir. 1963); *Sipowicz v. Wimble*, 370 F.Supp. 442, 448 (S.D.N.Y. 1974). Indeed there was no evidence of any unusual and extraordinary accident peculiar to the sea which could have sunk this vessel. *See United States National Bank of Galveston v. Maryland National Ins. Co.*, 218 F.Supp. 247 (S.D. Tex. 1963). Therefore,

---

**6.** *Compare Continental Ins. Co. v. Patton-Tully Transportation Co.*, 212 F.2d 543, 547 (5th Cir. 1954) (normal swells from passing vessel not peril of river in barge sinking) *with Allen N. Spooner & Sons, Inc. v. Connecticut Fire Ins.*

*Co.*, 314 F.2d 753, 756–57 (2nd Cir.), *cert. denied*, 375 U.S. 819, 84 S.Ct. at 56, 11 L.Ed.2d 54 (1963) (normal swells from passing ship overturns precarious derrick engaged in lifting constitute peril of sea).

the loss appears to have been a mere fortuity with the presumption being that its cause was by a peril of the sea. *See e. g., New York, New Haven and Hartford Railroad Co. v. Gray,* 240 F.2d 460, 464 (2nd Cir.), *cert. denied,* 353 U.S. 966, 77 S.Ct. 1050, 1 L.Ed.2d 915 (1957); *Boston Insurance Co. v. Dehydrating Process Co.,* 204 F.2d 441, 443 (1st Cir. 1953).

To counter this appellant argues that since the drifting hulk was discovered semi-submerged in calm seas, and sank in same, that a presumption arose that the vessel was unseaworthy and that this condition caused the sinking. *Tropical Marine Products v. Birmingham Fire Ins. Co. of Pa.,* 247 F.2d 116, 120 (5th Cir.), *cert. denied,* 355 U.S. 903, 78 S.Ct. 331, 2 L.Ed.2d 260 (1957). However, the raising of this presumption is not appropriate here. The STONEFIELD LADY was found drifting over a thousand miles from its departure port in the Gulf Stream, an ocean current which flows at speeds of three to five knots out of the Gulf of Mexico south around the Florida Keys then north along the east coast of the United States. Thus, the vessel could have gone down at some distance from the position where discovered by the Coast Guard. No evidence was put forward by either party as to the state of winds and seas at the most relevant points to this inquiry i. e. at the point the vessel started taking on water or, more importantly, where it became semi-submerged. *See id.* at 122. In the absence of evidence of the existence of calm seas and weather, this presumption cannot be asserted by the appellant.

■ However, assuming *arguendo* that the STONEFIELD LADY did sink in calm seas the presumption cited by appellant is unavailing. It may be rebutted by a showing of seaworthiness. If so rebutted, a "counter presumption arises that the unexplained sinking and consequent loss was caused by some extraordinary, although unknown and unascertainable, peril of the sea." *Boston Insurance Co. v. Dehydrating Process Co.,* 204 F.2d 441, 443 (1st Cir. 1953). *See Reisman v. New Hampshire Fire Insurance Co.,* 312 F.2d 17, 20 (5th Cir. 1963); *Tropical Marine Product v. Birmingham Fire Insurance Co. of Pa.,* 247 F.2d 116, 118 (5th Cir.), *cert. denied,* 355 U.S. 903, 78 S.Ct. 331, 2 L.Ed.2d 260 (1957).

■ On the issue of seaworthiness the only question raised as to the vessel was whether it was manned by a competent captain and crew.[7] Appellee testified that he hired a competent captain whom he had known for some time and had tested in maneuvering and rigging the vessel, albeit in a cursory manner. He also testified that he directed the captain, as per custom in the trade, to hire a crew of two for the vessel. Without determining credibility, this would appear to be sufficient evidence to rebut the presumption of unseaworthiness as a cause of a vessel's sinking in calm seas. Ultimately the insurer bears the burden of proving unseaworthiness, *see Saskatchewan Government Insurance Office v. Spot Pack,* 242 F.2d 385 (5th Cir. 1957), and appellant's bare insinuation that Gentile did not exist does not meet this burden. *See, e. g. Aguirre v. Citizens Casualty Co. of New York,* 441 F.2d 141, 144 (5th Cir.), *cert. denied,* 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971); *Lemar Towing, Inc. v. Fireman's Fund Insurance Co.,* 352 F.Supp. 652, 659–665 (E.D.La.1972) aff'd 471 F.2d 609 (5th Cir. 1972), *cert. denied,* 414 U.S. 976, 94 S.Ct. 292, 38 L.Ed.2d 219 (1973). Therefore, we conclude that on all lines of argument, in regard to loss by peril of the sea, that the District Court was correct in denying appellant's motions for a directed verdict or for judgment notwithstanding the verdict.

■ Turning to the issue of scuttling or barratry we find the appellant's position even weaker. All of the evidence presented from which an inference of scuttling could

---

7. No allegation was raised that the vessel was physically unseaworthy. *Lemar Towing, Inc. v. Fireman's Fund Insurance Co.,* 352 F.Supp. 652, 660 (E.D.La.1972) *aff'd* 471 F.2d 609 (5th Cir. 1972), *cert. denied,* 414 U.S. 976, 94 S.Ct. 292, 38 L.Ed.2d 219 (1973). Indeed, it appears that extra equipment was placed on board which enhanced the vessel's navigation and communication capabilities.

be made, also permits the inference that the loss was occasioned by the barratry of the master. The attempted holing of the hull, the portable pump being rigged on deck, the absence of personal effects and the wheel being lashed in two places, all are indicative of a planned sinking. But who's plan?

There is a basic lack of evidence of appellee's complicity in an intentional sinking of the boat. Appellant points to the drug smuggling scheme and the seizing of the LITTLE HORNET seventeen days prior to the discovery of the STONEFIELD LADY as providing a motive for covering up that vessel's involvement in the conspiracy. *See S. Felicione & Sons Fish Co. v. Citizens Casualty Co. of New York*, 430 F.2d 136, 139 (5th Cir. 1970), *cert. denied*, 401 U.S. 939, 91 S.Ct. 936, 28 L.Ed.2d 219 (1971). However, such reasoning is also consistent with providing the master with a motive for sinking her without the owner's permission. Since appellee received immunity from prosecution [8] and the value of the vessel exceeded its insurance coverage,[9] *see Northwestern Mutual Life Insurance Co. v. Linard*, 498 F.2d 556, 559 (2nd Cir. 1974), there was credible evidence upon which reasonable men could conclude that it was not in appellee's interest for the vessel to be scuttled. *See Fishing Fleet, Inc. v. Trident Insurance Company, Ltd.*, 598 F.2d 925, 928–29 (5th Cir. 1979).

Taking appellants' best arguments, the loss of an insured vessel in seaworthy condition in good weather and in calm seas from unknown causes, where the vessel might be engaged in an abortive illegal scheme may arouse suspicion. "But suspicion, even strong suspicion, is not an acceptable substitute for proof by a preponderance of the evidence." *Wenhold v. Royal Insurance Co.*, 197 F.Supp. 75, 79–80 (D.Mass.1961). Appellee was extensively examined and cross-examined before the jury and his credibility is not a question before this Court.

In sum, sufficient conflicting evidence was adduced to justify submission of the case to the trier of fact and for support of their verdict for appellee. *Boeing Co. v. Shipman*, 411 F.2d at 375. Therefore, the judgment of the District Court, in all regards, is AFFIRMED.

---

8. There appears to be no clear reference as to the timing of this grant of immunity relative to the discovery of the STONEFIELD LADY.

9. *Record* at 43, 120, 199, 201, 208.