**KILPATRICK MARINE PILING, a Partnership, and Savannah Bank and Trust Company, Plaintiffs-Appellees,**

v.

**FIREMAN'S FUND INSURANCE COMPANY, Defendant-Appellant.**

No. 85–8822.

United States Court of Appeals, Eleventh Circuit.

Aug. 4, 1986.

Gustave R. Dubus, III, Savannah, Ga., for defendant-appellant.

Edwin D. Robb, Jr., Savannah, Ga., for plaintiffs-appellees.

Before KRAVITCH and HATCHETT, Circuit Judges, and TUTTLE, Senior Circuit Judge.

CORRECTED OPINION

TUTTLE, Senior Circuit Judge:

This appeal is from a judgment based on a jury verdict in favor of the insured on a claim under a marine hull insurance policy. The jury, answering special interrogatories, found that the insured vessel sank as a result of a peril of the sea (or peril of the waters); that appellee, the insured, made no material misrepresentations in obtaining the policy; that appellant, the insurer, acted in bad faith in refusing to pay the claim; that this bad faith refusal to pay entitled appellee to $15,600 as a statutory penalty and $14,055.11 as attorney's fees; that the insured vessel was seaworthy at the inception of the policy; and that it was seaworthy at the time it sank. Following the jury verdict in favor of the insured, the trial court awarded 10% prejudgment interest. Appellant challenges the jury's findings and the court's award of 10% prejudgment interest.

## BACKGROUND

The insured vessel was made up of eight separate pontoons (or compartments) strapped together in two parallel rows of four each. They made, in effect, a square barge. The barge was used for repairing docks and other such structures by pulling next to the dock and providing a surface from which the repairs could proceed. The barge was anchored to the bottom of the water by two poles, one on the starboard forward pontoon and one on the port stern pontoon. These poles extended downward through the pontoon inside a pipe. This permitted the pontoon to rise and fall with the rise and fall of the tide. Both parties conceded that if a pole became bent so that the barge could not rise with the rising tide, the vessel would become submerged, take on water, and then sink.

On June 29, 1984, the barge was being used in dock repair at American Cyanamid Company in Savannah, Georgia. At four o'clock p.m., Jerry Kilpatrick spudded the barge and left it sitting level. At 7:35 to 7:40 p.m., a security guard for American Cyanamid observed that the barge was sit-

ting level. The following morning, at about 9:00 a.m., a utility operator noted that it was "tilted pretty far down in the water." By 10:00 a.m., the barge had sunk.

Appellee explains the sinking by referring to the conclusion drawn by one of its surveyors, who opined that since a large ocean-going vessel had passed the barge at about 8:30 on the morning of the sinking, a series of large waves caused by this vessel must have bent one of the poles, causing the barge to take on water, and eventually to sink.[1] Appellee, however, presented no direct testimony as to the size of the waves caused by the ocean-going vessel.

When the barge was raised, it was discovered that some 175 square feet of its bottom was rusted; it was also discovered that there were holes indicating deterioration in the barge's bottom.

## ISSUES ON APPEAL

We must resolve four basic questions:

(1) Whether the trial court erred by denying appellant's motion for judgment notwithstanding the verdict based on the grounds that the insurance policy was void because of appellee's misrepresentation of material facts.

(2) Whether the trial court erred by submitting to the jury the question whether the barge sank due to a peril of the seas (or waters.)

(3) Whether the trial court erred by submitting to the jury the question of appellant's bad faith refusal to pay the claim; and

(4) Whether the trial court erred by denying appellant's motion to amend the judgment to award 7% rather than 10% pre-judgment interest.

## I. MISREPRESENTATION OF MATERIAL FACTS

As an affirmative defense, appellant asserted that appellee misrepresented certain material facts in obtaining insurance in 1983. If appellant prevails on this issue, it prevails outright, for misrepresentation of any fact material to risk invalidates a marine hull insurance policy. *Gulfstream Cargo, Ltd. v. Reliance Ins. Co.*, 409 F.2d 974, 980 (5th Cir.1969). *See* L. Buglass, *Marine Insurance and General Average in the United States*, 23–27 (2d ed. 1981)(failure to make material disclosure entitles insurer to avoid contract). But before appellant can avoid the contract, it must prove its claim.

■ Appellant views as a material misrepresentation surveyor Scott's omission from his September 1983 survey of the fact that he observed rust, scale, deterioration, and water in the pontoons, as well as the fact that the pontoons could not be made watertight. Appellant also cites as a material misrepresentation the fact that plaintiff Jerry Kilpatrick submitted a survey showing the value of the barge as $77,609, without disclosing that the purchase price had been $25,000. According to appellant's underwriter, he would not have insured the barge if he had known any of these facts.

"The general rule of marine insurance, requiring full disclosure, is well settled in this circuit, and as a clear rule of maritime law it is the controlling rule even in the face of contrary state authority." *Steelmet v. Caribe Towing Corp.*, 747 F.2d 689, 695 (11th Cir.1984). Accordingly, the trial court instructed the jury that:

The law provides that contracts of marine insurance require the parties to exercise the most abundant good faith toward one another, and this obligation requires the party seeking insurance to disclose all facts and circumstances which are material to the risk and not within the knowledge of both parties.

The court then described materiality as that which could possibly influence the mind of a prudent and intelligent insurer in

---

1. Appellee could recover under the policy if the sinking was due to a peril of the waters, a latent defect, or the negligence of the crew. The jury found that the sinking was due to a peril of the waters. Appellee does not argue latent defect or crew negligence as alternative grounds for recovery.

determining whether he would accept the risk, and pointed out that concealment of such facts voids the policy, whether the concealment be due to fraud, negligence, accident, or mistake.[2] After being instructed on the law, the jury, in answer to a special interrogatory, concluded that appellee had not misrepresented a material fact.

Appellant argues that the trial court erred by submitting this issue to the jury. Appellee, on the other hand, argues that the question of materiality is one of fact, properly resolved by the jury. It also argues that the conditions alleged to have been material misrepresentations were irrelevant to the cause of the loss. It points to the testimony of David Scott that the pontoons had only negligible amounts of water and that the rust did not pose a serious concern since all barges have some degree of rust. As to the barge's not being watertight, Scott testified that he did not indicate the watertight integrity of the vessel because he was not asked to and because, according to him, many vessels are not absolutely watertight.

On the question of Jerry Kilpatrick's failure to disclose purchase value, he argues that he has made considerable improvements since purchase and that he used an acceptable valuation formula in arriving at a market value of $77,609.

A motion for directed verdict and judgment notwithstanding the verdict is proper only when facts and inferences point so strongly and overwhelmingly in favor of one party that reasonable persons could not reach a different conclusion. *Gregory v. Massachusetts Mutual Life Ins. Co.*, 764 F.2d 1437, 1440 (11th Cir.1985); *Boeing Company v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969).

Since we cannot say, as a matter of law, in light of appellee's explanation for the omissions, that reasonable persons would not differ on the question whether the omitted facts were material, we decline to disregard the jury's finding.

## II. PERIL OF THE SEA

Since we have concluded that appellant cannot avoid the policy, we must now consider whether the barge sank as the result of a covered peril. Appellee's marine hull insurance policy covered loss due to a peril of the waters. Appellee offers only one explanation for the sinking of the barge, the waves caused by the ocean-going vessel. Appellant cites *Continental Ins. Co. v. Patton-Tully Co.*, 212 F.2d 543, 547 (5th Cir.1954), in support of the proposition that ordinary waves of a passing vessel are not a peril of the waters. As additional authority, it cites *Western Assurance Co. v. Shaw*, 11 F.2d 495, 496 (3d Cir.1926). As contrary authority, appellee cites *Allen N. Spooner and Son, Inc. v. Connecticut Fire Ins. Co.*, 314 F.2d 753 (2d Cir.1963).

Appellee attempts to minimize the precedential value of *Continental Ins. Co. v. Patton-Tully Co.* by arguing that it is merely a ruling that there was no factual basis, in that particular case, to support a finding that wave wash from a towboat constituted a peril of the waters. It also considers significant the fact that the vessel in that case had a prior history of leaking through deteriorated pontoons of the hull. We quickly dispose of appellant's second contention, for it is irrelevant to our discussion here. That part of the opinion which discussed the vessel's history of leaking was addressed to the question whether the waves caused the sinking, not whether waves were a "peril of the river" within the meaning of the policy. *Continental, supra*, at 547. At this point in our discussion, we are not concerned with the question of causation. In any event, the *Continental* court stated that assuming that the sinking was due to wave wash, it did not believe that such waves constituted a "peril of the river." *Id.*

In arriving at this conclusion, the *Continental* Court cited the Third Circuit opinion in *Western Assurance Co. v. Shaw*. In

---

**2.** We believe this to be a correct statement of law. *See Gulfstream Cargo, Ltd., supra*, at 980–981 (quoting *Fireman's Fund Ins. Co. v. Wilburn*

*Boat Co.*, 300 F.2d 631, 646 (5th Cir.), *cert. denied*, 370 U.S. 925, 83 S.Ct. 17, 9 L.Ed.2d 92 (1962).

*Shaw*, the trial court found that "the [vessel's] final plunge was due to the swell of a steamer breaking over the port of the deck, which served as a washboard and filling her, ..." *Shaw, supra*, at 495. After finding that the swell proximately caused the sinking, the trial court improperly defined peril of the sea as "any threatening danger from the sea," the "operative cause," "the efficient cause," "the causa causans." *Shaw, supra*, at 496. In reversing, the Third Circuit held that the term "peril of the sea" is used to describe abnormal causes and extraordinary circumstances. *Id.* (citations omitted). Accordingly, it concluded that the swell from a passing steamer did not constitute a peril of the sea.

The Second Circuit, in *Allen N. Spooner and Son, Inc. v. Connecticut Fire Ins. Co.*, 314 F.2d 753 (2d Cir.1963), rejected both *Continental* and *Shaw* as articulating alternative holdings since in both cases the vessels were unseaworthy. *Spooner, supra*, at 756. The Second Circuit concluded that under the circumstances before it, the vessel's engagement in an extremely delicate operation, the waves from a passing vessel did constitute a peril of the sea. More particularly, the court held:

> In the present case, Stash was engaged in an extremely delicate operation. Without the use of side slings, the No. 12 could tilt only three degrees without danger to the derrick. Shipping above and below the site of operations was held up, so as to prevent swells. Under these circumstances, the swells caused by the passing freighter were unanticipated and extraordinary and constituted a "peril of the sea" within the meaning of the policy.

*Id.* at 756–57.

As was noted in *Darien Bank v. Travelers Indemnity Co.*, 654 F.2d 1015, 1020 (5th Cir.1981), the circumstances of the case determine whether the loss was caused by a peril of the sea. The Court pointed out in the text accompanying footnote six that mere swells from passing vessels may or may not be enough based on the circumstances of the case. *Id.* at 1020. In footnote six, the Court compared *Continental* with *Spooner*. It noted that "normal swells from passing vessel [are] not [a] peril of [the] river in barge sinking" but are with "precarious derrick engaged in lifting." *Id.*

■ Here, as in *Darien Bank*, there was no evidence of any unusual and extraordinary accident peculiar to the sea which could have sunk this vessel. *See Darien Bank, supra*, at 1020, (citing *United States National Bank of Galveston v. Maryland Ins. Co.*, 218 F.Supp. 247 (S.D. Tex.1963). Moreover, there was no evidence that the barge was engaged in a precarious or delicate operation or that the waves from the ocean-going vessel were in any way extraordinary. We therefore hold, as a matter of law, on the facts of this case, that the waves from the ocean-going vessel did not constitute a peril of the sea. *See also, Shaver Forwarding Co. v. The Eagle Star Ins. Co.*, 943 AMC 1178, 1189 (Ore.S.Ct.1943).

Having made this determination, we must now make our way through a near dizzying series of presumptions and rebuttals unique to marine law. The first of these is that when the sinking of a vessel seems a mere fortuity the presumption arises that it was due to a peril of the sea. *Darien Bank, supra*, at 1021; *see New York, New Haven and Hartford Railroad Co. v. Gray*, 240 F.2d 460, 464 (2d Cir.), *cert. denied*, 353 U.S. 966, 77 S.Ct. 1050, 1 L.Ed.2d 915 (1957); *Boston Insurance Co. v. Dehydrating Process Co.*, 204 F.2d 441, 443 (1st Cir.1953). This presumption gives way when met by a showing that the vessel sank in calm weather and seas. *Tropical Marine Products v. Birmingham Fire Ins. Co. of Pa.*, 247 F.2d 116, 120 (5th Cir.), *cert. denied*, 355 U.S. 903, 78 S.Ct. 331, 2 L.Ed.2d 260 (1957). From this collision arises a presumption that the vessel was unseaworthy. *Id.* This presumption, in turn, is rebutted by a showing of seaworthiness. *Darien Bank, supra*, at 1021.

Since appellee does not contest appellant's assertion of calm weather and seas,

we turn to consider the evidence of seaworthiness at the time of loss. Our consideration of this issue, however, is limited to determining whether there was sufficient evidence to support the jury verdict that the vessel was seaworthy[3] at the commencement of the policy and at the time of loss. *See Aguirre v. Citizens Casualty Co. of New York*, 441 F.2d 141, 133 (5th Cir.1971)(determining seaworthiness of vessel at particular moment in time is responsibility of trier of fact.)

Appellant does not challenge the seaworthiness of the vessel at the time of sinking, for to do so would, as it concedes, saddle it with the burden of proof. Instead, it argues that the vessel was unseaworthy at the inception of the policy, thus voiding the policy. Appellant believes this to be the more advantageous path because the insured warrants to the insurer the seaworthiness of the vessel at the inception of the policy. *Saskatchewan Government Insurance Office v. Spot Pack*, 242 F.2d 385 (5th Cir.1957); *Tropical Marine Products; Gulfstream Cargo, Ltd. v. Reliance Insurance Co.*, 409 F.2d 974 (5th Cir.1969); *Lemar Towing Company v. Fireman's Fund Insurance Company*, 352 F.Supp. 652 (E.D.La.1973), *aff'd per curiam*, 471 F.2d 609 (5th Cir.1973).

■ Regardless of the path chosen, we reach the same conclusion. We believe the evidence is sufficient to support the jury's finding that the vessel was seaworthy at the inception of the policy. Appellant offered the following evidence to show that the vessel was unseaworthy at the inception of the policy on May 1, 1984: (1) the testimony of surveyor Sullivan that based upon his inspection of the wasted areas of two pontoons and an apparent attempt to patch one of these wasted areas with a cement "soft patch," the barge was unseaworthy on May 1, 1984; (2) the testimony of Carl Kleeman, who supervised the raising of the barge, that in view of the leaks

and "soft patch" he would not have put the barge to use on the Savannah River.

Appellee's principal evidence of seaworthiness was that if the holes in the pontoons had existed before the sinking, there would have been prior evidence of a list on the barge and it would have taken on water. Appellee presented evidence that the barge never took on water and never had a list.

After considering this conflicting evidence, the jury found the vessel seaworthy on May 1, 1984. Since there is sufficient evidence to support this finding, we affirm it.

■ Inasmuch as appellant chose not to attempt to prove that the vessel became unseaworthy after May 1, 1984, we must assume that the vessel was seaworthy at the time of its sinking.[4] With this showing of seaworthiness "a counter presumption arises that the unexplained sinking and consequent loss was caused by some extraordinary, although unknown and unascertainable, peril of the sea." *Insurance Co. of North American v. Lanasa Shrimp Co.*, 726 F.2d 688, 690 (11th Cir.1984)(quoting *Darien Bank, supra*, at 1021)(quoting *Boston Insurance Co. v. Dehydrating Process Co.*, 204 F.2d 441, 443 (1st Cir. 1953). This counter presumption is the last of the presumptions and rebuttals that we consider. It brings us full circle, to a conclusion that the vessel sank due to a peril of the sea, albeit one which is unknown and unascertainable. In the end, the insurer must bear the loss. Appellant, however, refused to pay the claim and appellee claimed the refusal was in bad faith.

## III. STATUTORY BAD FAITH PENALTY AND ATTORNEY'S FEES

Official Code of Georgia Annotated § 33–4–6 provides that, in the event of a loss which is covered by a policy of insurance, the insurer refuses to pay within 60 days after a demand has been made, and

---

3. In answer to a special interrogatory, the jury found that the vessel was not unseaworthy on the date of loss and was not unseaworthy at the commencement of the policy.

4. Indeed, the jury so found.

such refusal to pay was in bad faith, the insurer shall be liable to pay the holder not more than 25% of the liability of the insurer for the loss and all reasonable attorney's fees.

The jury found that appellant acted in bad faith in failing to pay the claim. Accordingly, it awarded $25,600 as a statutory penalty and $14,055.22 as attorney's fees. The trial court denied appellant's motion for judgment notwithstanding the verdict on this issue.

Appellant attacks the trial court decision on two fronts. First, appellant argues that appellee cannot recover a statutory penalty and attorney's fees because it failed to comply with the demand requirement of § 33-4-6. Second, appellant argues that the evidence was insufficient to support a finding of bad faith refusal to pay. Because of the manner of our resolution of this issue, we need consider only appellant's first argument.

Under O.C.G.A. 33-4-6, the holder of the policy must demand payment. After such demand, the insurer has 60 days to make payment. Appellant claims that since the loss occurred on June 30, 1984, and since the policy allowed the insurer 30 days to pay after proof of loss and interest was presented, demand would not be in order until July 30, 1984.[5] Appellant denied the claim on August 28, 1984. Appellee filed suit on September 13, 1984. According to appellant, this was only 45 days after plaintiffs had a right to demand payment, yet the statute allows the insurer 60 days to make payment.

In response, appellee argues that appellant's denial of its claim on August 28, 1984 constituted a waiver of compliance with any and all statutory demand requirements. In support of this argument it cites *Sawyer v. C & S National Bank*, 164 Ga.App. 177, 296 S.E.2d 134 (1982); *Gulf*

*Life Insurance Co. v. Matthews*, 66 Ga. App. 162, 164–166, 17 S.E.2d 247 (1941). For the opposite principle, appellant cites *Continental Life Ins. Co. v. Wilson*, 36 Ga.App. 540, 137 S.E. 403 (1927). We now consider each of these cases.

We do not read *Sawyer v. C & S National Bank* as supporting appellee's argument. The court found that the 60 day period was waived because the insurer filed an action for declaratory judgment to relieve itself of liability under the policy. The court opined that:

The purpose of the waiting period, which is to protect the insurer by giving it a reasonable time to investigate the claim, examine the facts, and determine its liability, is no longer served when the insurer files suit seeking to relieve itself of liability under the policy.

*Sawyer, supra,* at 184, 296 S.E.2d 134 (citations omitted.) We reject appellee's invitation to extend *Sawyer's* rationale to this case, where no such suit has been filed. Moreover, we reject appellee's suggestion that a denial of a claim is somehow irrevocable, whereas a declaratory action leaves the insurer the option to examine the facts, determine its liability and decide whether to pay.[6]

In the second case which appellee cites, *Gulf Life Insurance Co. v. Matthews,* the claimant made demand under a double indemnity life insurance policy a few days after the death of his son. The insurer sent claimant a letter indicating that it was unwilling to pay the double indemnity amount. The court held that this refusal to pay relieved claimant of the necessity of furnishing proofs of death or making any subsequent demand for payment. The court concluded that the right of the plaintiff to file suit immediately accrued. *Matthews, supra,* at 165.

5. Appellant cites a number of Georgia cases to support the proposition that a demand is not effective until a demand for immediate payment is in order and to support the related proposition that a demand is not in order if the policy allows the insurer time before payment.

6. Appellee does not explain what prevents an insurer from reconsidering and deciding to pay a claim that is initially denied. Nor do we find anything inherently *unalterable* about an insurer's denial of a claim.

We agree with appellant that *Matthews* is distinguishable from the present case. In *Matthews,* the court held that the denial waived the proof of loss requirement, and thus, the claimant did not have to await the furnishing of the proof of loss before making a demand. Therefore, his earlier demand was sufficient. *Matthews* does not govern this case because the 30 days allowed in the policy was not waived, as the denial occurred after the 30 days.[7]

Finally, we consider the case which appellant cites, *Continental Life Ins. Co. v. Wilson, supra.* There, the insurance company denied the claim on December 7, 1925. The claimant filed suit on January 12, 1926. The claimant could not recover statutory penalties and attorney's fees since he filed suit within the 60 day statutory period.

Appellee attempts to distinguish *Wilson* by arguing that it merely holds that plaintiff's complaint was subject to a general demurrer because the complaint did not allege "the failure of the insurance company to pay the loss within sixty days after demand." Appellee seeks to minimize the precedential value of *Wilson* because it arose under outdated pleading rules.

We do not believe that the fact that the procedural posture of the case was an appeal of the overruling of general and special demurrers detracts from the legal basis of the opinion. The Georgia trial court overruled the demurrer to the allegations seeking recovery of a penalty and attorney's fees. The basis of the demurrer was the failure of the complaint to allege a failure of the insurance company to pay the loss within sixty days after demand. The Georgia Court of Appeals reversed the trial court. Thus, it is apparent that the insurer's denial of the claim did not waive the 60 day statutory period. Otherwise, the complaint would not have been subject to a demurrer on this basis.

■ Our review of the cases convinces us that appellant's denial of the claim did not waive the 60 day statutory period, and that appellee's filing suit within this period, without making a demand for payment, precludes the recovery of a statutory penalty and attorney's fees. It is not too much to require that one who seeks the benefits of a legislative policy choice follow the procedure set out by the legislature.[8] Thus, we reverse the award of a statutory penalty and attorney's fees.

## IV. RATE OF PREJUDGMENT INTEREST

The district court awarded prejudgment interest of 10%. Appellant moved to amend the judgment to reduce the interest to 7%. We now consider appellant's claim that the district court erred in denying its motion.

Appellant argues that since this case was brought under the court's diversity jurisdiction, and since prejudgment interest is not the sort of matter where federal supremacy is necessary, state law should govern. State law provides a rate of 7%. O.C.G.A. § 7-2-4.

Appellant, however, concedes that admiralty courts have discretion in deciding prejudgment interest. *Gator Marine Service Towing, Inc. v. J. Ray McDermott & Co.,* 651 F.2d 1096 (5th Cir, Unit A, 1981), but insists that state law is one of the factors to be considered. *Id.* at 1101.

The heart of the dispute on this issue is that appellant cites *Wilburn Boat Co. v. Fireman's Fund Ins. Co.,* 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955), for the proposition that state law applies where there is no federal rule which takes supremacy

---

7. In *Continental Life Ins. Co. v. Wilson, supra,* denial of the claim waived the insurer's right to rely on the provision in the policy that suit not be instituted prior to the expiration of sixty days after the proof of loss. It did not, however, waive the 60 day statutory period.

8. Appellee makes the alternative argument that appellant's course of conduct constituted a waiver of the policy provision which allowed the insurer 30 days to pay after the proof of loss. Since the 30 day period was waived, it claims that its oral demand July 2, 1984, was legally sufficient, and more than sixty days before it filed suit on September 13, 1984. We reject appellee's alternative argument.

while appellee cites *Continental Casualty Co. v. Canadian Universal Ins. Co.*, 605 F.2d 1340, 1344 (5th Cir.1979) and *Miller Industries v. Caterpillar Tractor Co.*, 733 F.2d 813, 823 (11th Cir.1984), for the proposition that federal law supplants state law as long as there is some governing principle of federal law. In this instance, the governing principle, well settled in admiralty law, is that admiralty courts have discretion in awarding prejudgment interest.

■ In *Wilburn Boat*, the Supreme Court applied state law when it found no federal admiralty law on the subject. *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. at 314–16, 75 S.Ct. at 370–72. It did not, as appellant suggests, weigh the relative importance of the state and federal law to consider whether federal law should take supremacy. There simply was no federal law.[9] We therefore agree with appellee that federal rather than state law controls.[10] There was no abuse of discretion in the court's award of 10% prejudgment interest.[11] *See, Miller Industries v. Caterpillar Tractor Co.*, 733 F.2d 813, 822–23 (11th Cir.1984)(affirming grant of 10% prejudgment interest); *United States Fire Ins. Co. v. Cavanaugh*, 732 F.2d 832, 835 (affirming grant of 12% prejudgment interest).

The judgment is AFFIRMED as respects the issues numbered 1, 2 and 4 above. It is REVERSED as respects issue numbered 3.

---

9. Indeed, in *Kossick v. United Fruit Co.*, 365 U.S. 731, 742, 81 S.Ct. 886, 894, 6 L.Ed.2d 56 (1961). The Court explained *Wilburn Boat* as follows: "[The] application of state law in that case was justified by the Court on the basis of a lack of any provision of maritime law governing the matter there presented."

10. The fact that this suit was brought under the court's diversity jurisdiction does not affect our conclusion. The Supreme Court in *Kossick v. United Fruit Co., supra*, applied federal (admiralty law) rather than state law in a diversity suit. *See Continental Casualty Co. v. Canadian Universal Ins. Co., supra*, at 1344 (even though action brought under diversity jurisdiction, maritime law governs.)

11. In deciding to award 10% prejudgment interest, the court considered evidence that appellee was paying interest to its bank loss payee at 11.5%.