[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-13243
_____

D.C. Docket No. 0:09-cv-60551-WJZ


AIG CENTENNIAL INSURANCE COMPANY,

Plaintiff -
Counter Defendant -
Appellee,

versus

J. BRIAN O'NEILL,
CAROLINA ACQUISITION LLC,

Defendants -
Counter Claimants -
Appellants,

BANK OF AMERICA N.A.,
a.k.a. Bank of America Corp,

Defendant - Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(April 10, 2015)

Before TJOFLAT and JULIE CARNES, Circuit Judges, and DuBOSE,[*] District Judge.

TJOFLAT, Circuit Judge:

This case involves a disputed marine insurance policy covering a sixty-six foot sport-fishing vessel, the *Bryemere*.  It comes to us on appeal from an eight-day bench trial conducted in the United States District Court for the Southern District of Florida.  Finding no reversible error, we affirm.

I.

A.

Brian O'Neill first set his sights on the *Bryemere* in 2006.  He signed a purchase-and-sale agreement for the vessel in March 2007, which fixed its price at $1.575 million plus the trade of another vessel valued at $700,000.  O'Neill's acceptance was contingent on a successful marine survey and sea trial to examine the *Bryemere* before purchase.  O'Neill hired Thomas Price, a marine surveyor, to

_____

[*] Honorable Kristi DuBose, U.S. District Judge for the Southern District of Alabama, sitting by designation.

2

conduct the pre-purchase investigation. Price documented his findings and issued an initial report estimating the *Bryemere*'s market value at approximately $1.875 million. O'Neill's project manager for the transaction, L.J. Gallagher, later contacted Price to request an increase in the vessel's valuation. Price acquiesced, reissuing the initial pre-purchase investigation but upping the *Bryemere*'s market value to $2.35 million. The survey also revealed that the vessel was in working condition but in need of repairs. O'Neill knew he would be on the hook for procuring these improvements, so he sought a reduction in the purchase price. The seller agreed, lowering the cost of the vessel by $150,000 for an adjusted sale price of $2.125 million.

As he negotiated the *Bryemere*'s price, O'Neill began laying the ground work for its eventual purchase. He incorporated a limited-liability company in the state of Rhode Island, Carolina Acquisition, LLC ("Carolina") to take ownership of the vessel. O'Neill is Carolina's only shareholder, and Carolina is the *Bryemere*'s registered title owner. With Carolina at his side, O'Neill turned his focus toward two remaining tasks: financing and insuring the *Bryemere*.

3

B.

O'Neill applied for a preferred ship mortgage—a specific type of mortgage governed by federal law[1]—with Bank of America, N.A. ("BOA") to fund the *Bryemere*'s cost. Acting through a mortgage broker, Beacon Marine Credit ("Beacon"), O'Neill submitted to BOA an initial loan request for $1.83 million. BOA granted the loan. Although it was O'Neill who filed the original application, O'Neill signed the mortgage in his capacity as managing member of Carolina.[2] With Carolina as the mortgagor, O'Neill assumed the role of guarantor in his personal capacity. The *Bryemere*, meanwhile, served as collateral: the loan agreement gave BOA a security interest in the vessel such that, in the event of default, BOA could repossess the *Bryemere*, sell it, and use the proceeds to pay

---

[1] The terms of a preferred ship mortgage are governed by 46 U.S.C. §§ 31301–31343. A preferred mortgage "is a lien on the mortgaged vessel in the amount of the outstanding mortgage indebtedness secured by the vessel." *Id.* § 31325(a). Prior to 1920, courts sitting in admiralty lacked jurisdiction to hear cases regarding ship mortgages. *See, e.g.*, *Bogart v. The Steamboat John Jay*, 58 U.S. 399, 401–02, 15 L. Ed. 95 (1854) ("[Admiralty courts] have no jurisdiction in questions of property between a mortgagee and the owner. . . . [M]ere mortgage of a ship . . . is a contract without any of the characteristics or attendants of a maritime loan . . . ."). Congress changed this state of affairs by passing the Ship Mortgage Act of 1920, which was later recodified as the Maritime Commercial Instruments and Liens Act of 1988, Pub. L. No. 100-710, 102 Stat. 4735 (codified as amended at 46 U.S.C. §§ 31301–31343). In so doing, Congress enabled "a mortgagee to bring a cause of action *in rem* for the foreclosure of a preferred ship's mortgage" and endowed "federal district courts exclusive original jurisdiction to hear that cause of action." *Beluga Holding, Ltd. v. Commerce Capital Corp.*, 212 F.3d 1199, 1202 (11th Cir. 2000) (footnote omitted).

[2] The mortgage lists Carolina as the "mortgagor" and "100% sole owner" of the *Bryemere*. Accompanying the mortgage is a certificate of documentation, issued by the U.S. Coast Guard, as further proof that Carolina owned the *Bryemere*. A certificate of documentation is one of the prerequisites for establishing a preferred ship mortgage. 46 C.F.R. § 67.1.

4

down any outstanding debt.  46 U.S.C. § 31325(b)(1) ("On default of any term of the preferred mortgage, the mortgagee may enforce the preferred mortgage lien in a civil action in rem . . . .").

After submitting the initial application, O'Neill, acting through Beacon, asked for an increase in the loan amount from $1.83 million to $1.976 million; BOA granted that request.  The loan amount was set, and the preferred ship mortgage was signed and dated on April 18, 2007.

## C.

As a condition of the loan, BOA required proof of insurance for the *Bryemere*.  In addition, BOA requested that the insurance policy contain a mortgage clause that would protect BOA's interests as a mortgagee in the event the underlying insurance policy was found void.[3]  Unfortunately for all parties involved, this straightforward request quickly turned Sisyphean.

## 1.

It all started when O'Neill's insurance broker, Willis of Pennsylvania, Inc. ("Willis"), sought an insurance quote for the *Bryemere* from AIG Centennial Insurance Company ("AIG").  Susan Bonner, an underwriter, handled the

---

[3] Also known as a "standard mortgage clause," or a "standard mortgagee clause," it "protects the mortgagee's interest even if the insured mortgagor does something to invalidate the policy."  Black's Law Dictionary 1104 (9th ed. 2009).

application process on behalf of AIG.  Sharon King, a broker, was assigned to O'Neill's case on behalf of Willis.  The first problem arose when, instead of working directly with King, O'Neill delegated the task of obtaining insurance for the *Bryemere* to his executive secretary, Desiree Foulds.  And the problem was compounded when, instead of explaining the insurance-application process to Foulds, King forwarded the application to Foulds without comment and returned the application Foulds had completed to Bonner without reviewing it for accuracy or completeness.  Needless to say, this was a recipe for error.

As she filled out the insurance application, Foulds made three mistakes that are relevant to this appeal.  First, she listed O'Neill as the owner of the vessel.  Carolina, in fact, held legal title to the *Bryemere*.  *See supra* part I.A.  Second, in response to a question about whether the owner or captain had ever suffered any "losses," she disclosed one prior loss in 2003, when O'Neill lost a boat due to a fire.  But in the marine-insurance context, the term "loss" encompasses not only the total physical loss of a vessel but also any damage causing injury to the property insured.  Under this rubric—and by his own admission at trial—O'Neill had suffered two additional losses that went undisclosed: propeller damage to his Ocean yacht and a blown engine on his sailing vessel.  Third, Foulds listed the *Bryemere*'s purchase price as $2.35 million.  The closing statement, however, reflects a purchase price of $2.125 million.

6

2.

Foulds sent the completed application to King; King then forwarded it to Bonner at AIG. Bonner received the application and, in reliance thereon, sent King an insurance quote over email on April 17, 2007. The quote listed O'Neill as the named insured. Bonner's email, to which the insurance quote was attached, contained a request that O'Neill submit a signed letter of compliance, indicating that he would complete the repairs to the *Bryemere* recommended by Price's initial marine survey. Two days later, on April 19, 2007, at 5:07 p.m., King sent an insurance binder to Foulds. An insurance binder is "[a]n insurer's memorandum giving the insured temporary coverage while the application for an insurance policy is being processed or while the formal policy is being prepared." Black's Law Dictionary 190 (9th ed. 2009). The binder listed O'Neill as the named insured. Four minutes later, King sent a revised binder to Foulds listing Carolina as the named insured. King testified, and the District Court found, that she changed the named insured on the binder in response to a request made by BOA.[4]

---

[4] Based on this testimony, the District Court found that BOA, having reviewed the initial insurance binder and having spotted the error in the named insured, "request[ed] the binder be revised to reflect 'Carolina Acquisition, LLC' as the named insured on the Policy." "We review factual findings made by a district court after a bench trial for clear error, which is a highly deferential standard of review." *Renteria-Marin v. Ag-Mart Produce, Inc.*, 537 F.3d 1321, 1324 (11th Cir. 2008). BOA believes that this factual finding was clearly erroneous. We disagree.

King testified point-blank that BOA asked her to issue a revised binder with Carolina as the named insured. King's testimony to this effect was unambiguous. And although King later

7

But King never informed Bonner that Carolina—not O'Neill—should have been the named insured on the policy.

The next day, April 20, AIG issued the final policy. The declarations page of that policy listed O'Neill as the named insured and the policy's effective date as April 19, 2007. As BOA requested, the policy also contained a standard mortgage clause. In contrast with the preferred ship mortgage, there is no indication that O'Neill took out the insurance policy in his capacity as managing member of Carolina LLC. The insurance application names only "J. Brian O'Neill" as the insured under the policy.

## II.

Following the *Bryemere*'s purchase, O'Neill invested $225,000 to pay for the repairs recommended by Price's marine survey. On June 29, 2007, the *Bryemere* departed Palm Beach, Florida, for Newport, Rhode Island. During the voyage, the crew "noticed considerable flexing in the vessel's hull." Upon arrival in Rhode Island, several marine experts inspected the *Bryemere* and concluded that it suffered from a number of structural defects rendering the vessel, in the words of

clarified that BOA's request was communicated to her through Foulds, "[t]he credibility of a witness is in the province of the factfinder and this court will not ordinarily review the factfinder's determination of credibility." *Crystal Entm't & Filmworks, Inc. v. Jurado*, 643 F.3d 1313, 1320 (11th Cir. 2011) (quotation marks omitted).

one marine surveyor, "un-seaworthy, dangerous and unsafe for any use."[5]  O'Neill

then submitted a claim to AIG for coverage under his insurance policy.

In response, AIG filed in the United States District Court for the Southern

District of Florida a declaratory judgment action seeking affirmation that the

insurance policy was void ab initio as to both O'Neill and BOA.  After an eight-

day bench trial, the District Court issued an order finding that neither O'Neill nor

BOA could recover under the policy.  As for O'Neill, the District Court held that

the misrepresentations regarding O'Neill's prior loss history and the *Bryemere*'s

purchase price—contained in the application for insurance completed by Foulds on

O'Neill's behalf—rendered the policy void ab initio under the maritime doctrine of

*uberrimae fidei*, or utmost good faith.  As for BOA, the District Court held, among

other things, that the named insured on the policy, O'Neill, was not the mortgagor

on the loan and that BOA had no rights under the standard mortgage clause as a

result.  O'Neill and BOA timely appealed.

### III.

On appeal, O'Neill and BOA advance two lines of argument.  O'Neill

contends that the District Court erred in holding that his misrepresentations on the

---

[5] Unsurprisingly, these defects inspired litigation.  Carolina brought suit against the *Bryemere*'s seller and Price, the marine surveyor, among others.  At trial, O'Neill testified that the case settled for $1.95 million.

9

insurance application violated the duty of utmost good faith—and thus voided the insurance policy—because the terms "purchase price" and "loss history" were ambiguous and because, in any event, the misrepresentations were not material. As a corollary to this argument, O'Neill says that the District Court improperly addressed the misrepresentation of his loss history, an issue he claims rested outside the scope of the pleadings and the pretrial stipulation.

BOA, meanwhile, maintains that the standard mortgage clause is a valid contract binding on both BOA and AIG. And like O'Neill, BOA also identifies a procedural misstep: the District Court, BOA argues, should not have ruled on the validity of the standard mortgage clause in the first place because it, too, was outside the scope of the pleadings and the pretrial stipulation. We address these arguments in turn.

### A.

Marine insurance is a curious legal creature, bearing the markings of both the state common law of contracts and the federal common law of admiralty. Although the Admiralty Clause of the United States Constitution vests the federal courts with jurisdiction to hear maritime-contract cases,[6] "it does not follow . . .

---

[6] The United States Constitution, Article III, § 2, cl. 1, provides in pertinent part: "The judicial Power shall extend . . . to all Cases of admiralty and maritime Jurisdiction . . . ." Congress has endowed federal district courts with "original jurisdiction, exclusive of the courts of the States, of: (1) Any civil case of admiralty or maritime jurisdiction . . . ." 28 U.S.C. § 1333.

that every term in every maritime contract can only be controlled by some federally defined admiralty rule." *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 313, 75 S. Ct. 368, 370, 99 L. Ed. 337 (1955). In the absence of a "judicially established federal admiralty rule," we rely on state law when addressing questions of marine insurance. *Id.* at 314, 320–21, 75 S. Ct. at 370, 373–74.

1.

The age-old federal marine-insurance doctrine of *uberrimae fidei* governs O'Neill's argument and provides "the controlling federal rule even in the face of contrary state authority." *Steelmet, Inc. v. Caribe Towing Corp.*, 747 F.2d 689, 695 (11th Cir. 1984); *see also HIH Marine Servs., Inc. v. Fraser*, 211 F.3d 1359, 1362 (11th Cir. 2000) ("It is well-settled that the marine insurance doctrine of *uberrimae fidei* is the controlling law of this circuit."). *Uberrimae fidei* reflects "an enlightened moral policy" based upon the presumption that "the party

---

In reading these two provisions, the Supreme Court has concluded that if a contract constitutes a "maritime contract"—an inquiry that turns on "the nature and character of the contract" and whether "it has reference to maritime service or maritime transactions"—it falls within the ambit of federal jurisdiction. *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 24, 125 S. Ct. 385, 393, 160 L. Ed. 2d 283 (2004) (quotation marks omitted); *see also id.* at 23, 125 S. Ct. at 392 ("Our authority to make decisional law for the interpretation of maritime contracts stems from the Constitution's grant of admiralty jurisdiction to federal courts."). The insurance policy we consider here, without doubt, qualifies as a maritime contract. *Ins. Co. v. Dunham*, 78 U.S. 1, 33–34, 20 L. Ed. 90 (1870). The District Court properly exercised its jurisdiction as a result. We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

11

procuring insurance, is not . . . in possession of any facts, material to the risk which he does not disclose." *McLanahan v. Universal Ins. Co.*, 26 U.S. 170, 185, 7 L. Ed. 98 (1828). Indeed, "[i]t is the duty of the [insured] to place the underwriter in the same situation as himself." *Sun Mut. Ins. Co. v. Ocean Ins. Co.*, 107 U.S. 485, 510–11, 1 S. Ct. 582, 600, 27 L. Ed. 337 (1883) (quotation marks omitted). And from duty springs obligation: an insured must "fully and voluntarily disclose to the insurer all facts material to a calculation of the insurance risk." *Fraser*, 211 F.3d at 1362. To decide whether a fact is material, we inquire whether it could "possibly influence the mind of a prudent and intelligent insurer in determining whether he would accept the risk." *Kilpatrick Marine Piling v. Fireman's Fund Ins. Co.*, 795 F.2d 940, 942–43 (11th Cir. 1986). In this way, we have clarified, materiality is a concept "broadly defined." *Fraser*, 211 F.3d at 1363–64.

An insured who conceals or misrepresents a material fact commits "manifest fraud, which avoids the policy." *McLanahan*, 26 U.S. at 185. That holds true regardless of whether the misrepresentation is "[willful] or accidental, or result[s] from mistake, negligence or voluntary ignorance." *Steelmet*, 747 F.2d at 695 (quotation marks omitted). Commonsense dictates such an approach—"the law has placed the burden of good faith disclosure with the person in the best position to know all the facts: the insured." *Fraser*, 211 F.3d at 1363.

12

The duty of utmost good faith will thus render this insurance policy void ab initio if (1) O'Neill made a misrepresentation to AIG and (2) that misrepresentation was material. "Mixed questions of law and fact, such as questions of materiality, . . . involve assessments peculiarly within the province of the trier of fact and hence are reviewable under the clearly erroneous rule." *Lucas v. Fla. Power & Light Co.*, 765 F.2d 1039, 1040–41 (11th Cir. 1985).[7] "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395, 68 S. Ct. 525, 542, 92 L. Ed. 746 (1948).

2.

The District Court determined that O'Neill misrepresented the purchase price on his application for insurance. We cannot say this finding was clearly erroneous.

Elementary mathematics explains why. O'Neill paid $1.575 million for the *Bryemere*, plus the trade of another vessel valued at $700,000, for a total cost of $2.275 million. Anticipating the cost of future repairs following the *Bryemere*'s

---

[7] The parties dispute whether a material-misrepresentation claim under the doctrine of *uberrimae fidei* must be pleaded with particularity. *See* Fed. R. Civ. P. 9(b). We need not reach a decision on that question, however, to decide this case, which comes to us on appeal from a bench trial.

13

purchase, O'Neill negotiated a $150,000 adjustment downward in the price, for an adjusted sale price of $2.125 million. This figure is reflected in the closing statement for the vessel and is not disputed by the parties. Instead of providing that number, however, O'Neill's insurance application lists the purchase price at $2.35 million, a $225,000 misrepresentation.

But O'Neill objects to this calculation. He says we should include in the purchase price an additional $225,000 for the repairs AIG required him to make as a prerequisite for obtaining insurance. Adding $225,000 on to the adjusted sale price of $2.125 million, O'Neill contends, means the true purchase price of the *Bryemere* was accurately reflected in his insurance application at $2.35 million.[8]

As the District Court noted, however, O'Neill had already obtained a $150,000 reduction in the purchase price in anticipation of having to fund the repairs recommend by the Price survey report. So O'Neill wants to have it both ways: he wants to benefit from negotiating a lower price, but he does not want that lower price to appear on the insurance application, presumably so he can benefit from an increase in the value of the insurance policy. After all, adding the cost of intended repairs to the actual purchase price would inflate the value of the unrepaired vessel. Underwriters use the purchase price to determine the hull value

---

[8] The parties have stipulated that O'Neill paid $225,000 to fund the repairs recommended by the Price survey report.

14

at the time the policy issues.  If the purchase price were inflated to account for intended repairs, the true value of the hull at the time of purchase would be skewed.

O'Neill offers one additional point for us to consider.  Relying on state contract law, he argues that the term "purchase price" on the insurance application was ambiguous and therefore should be interpreted in favor of the insured.  Purchase price is not an ambiguous term.  It simply means the value given in return for an item.  But even assuming the term is ambiguous, it matters not.  The federal maritime doctrine of *uberrimae fidei*—not state contract law—governs this dispute, and it provides no refuge in claiming ambiguity.  *See Steelmet*, 747 F.2d at 695 (noting that a misrepresentation, even if it is a result of "mistake, accident, or forgetfulness, is attended with the rigorous consequences that the policy never attaches and is void" (quotation marks omitted)).

### 3.

The District Court proceeded to hold that this misrepresentation was material and thus voided the policy.  The District Court did not clearly err in so holding.

Our circuit has stressed that questions of materiality must be evaluated from the perspective of a reasonable insurer.  We ask whether a fact could "possibly influence the mind of a prudent and intelligent insurer in determining whether he

15

would accept the risk." *Kilpatrick*, 795 F.2d at 942–43; *see also* Black's Law Dictionary 670 (9th ed. 2009) (defining a material fact as "[a] fact that is significant or essential to the issue or matter at hand").

Under that formulation, the District Court could have found that O'Neill's misrepresentation of the *Bryemere*'s purchase price was material. O'Neill misrepresented the price of the vessel by almost a quarter-million dollars. The District Court heard testimony indicating that a vessel's purchase price would hold sway over the mind of an insurer when determining whether to assume the underwriting risk. For example, underwriters Sean Blue and Susan Bonner testified that insurance companies routinely rely on the vessel's purchase price in determining coverage limits for a given vessel and in determining the amount of coverage provided under a mortgage clause.[9] This makes good business sense: the

---

[9] The District Court heard the following exchange at trial between Bonner and counsel for AIG:

Q:     What is the relationship when you're writing a breach of warrantee [sic] coverage between the purchase price and the amount of the loan coverage you're willing to write?

A:     Our guideline is about 80 percent. We will accept an amount about 80 percent or less.

Q:     80 percent of what?

A:     The loan versus the total price of the vessel.

Q:     So the loan [coverage] is 80 percent of the purchase price?

A:     Yes.

16

vessel's purchase price, after all, "provides an objective measure of the vessel's worth." *N.H. Ins. Co. v. C'Est Moi, Inc.*, 519 F.3d 937, 939 (9th Cir. 2008)

In fact, our circuit has concluded, in an unpublished opinion, that the misrepresentation of a vessel's purchase price has the potential to be material so as to void an insurance policy under the duty of utmost good faith. *Markel Am. Ins. Co. v. Nordarse*, 297 F. App'x 852, 853 (11th Cir. 2008) (per curiam) (unpublished) (affirming the grant of summary judgment in favor of an insurer in light of a $54,000 misrepresentation in purchase price on a vessel worth, at most, $126,000).[10]

The District Court did not clearly err in its determination that O'Neill committed a material misrepresentation rendering void ab initio his insurance

---

[10] Other circuits appear to have held that a misrepresentation of the purchase price is material as a matter of law. *See, e.g.*, *AGF Marine Aviation & Transp. v. Cassin*, 544 F.3d 255, 265 (3d Cir. 2008) ("[W]hen a marine insurer asks for the purchase price, it is a fact material to the risk, the misrepresentation of which violates *uberrimae fidei*."); *N.H. Ins. Co. v. C'Est Moi, Inc.*, 519 F.3d 937, 939–40 (9th Cir. 2008) ("[W]hen a marine insurance application specifically asks for the purchase price, the insured may not substitute, without a clear explanation, the present market value for the actual purchase price. . . . An insured is not free to substitute his own subjective evaluation of worth for what the insurance company sought to obtain, namely a purchase price that can be presumed to be objective because it was arrived at through arm's length negotiations between parties with opposing interests." (citation omitted) (quotation marks omitted)). Our circuit's approach in this area has been—and continues to be—that the materiality of a misrepresentation is a question for the factfinder "that can be decided as a matter of law if reasonable minds could not differ on the question." *Woods v. Indep. Fire Ins. Co.*, 749 F.2d 1493, 1496 (11th Cir. 1985) (quotation marks omitted); *see generally Kilpatrick Marine Piling v. Fireman's Fund Ins. Co.*, 795 F.2d 940 (11th Cir. 1986) (articulating this proposition in the context of *uberrimae fidei*).

policy with AIG.[11]  As a result, we need not—and do not—consider O'Neill's

arguments regarding the District Court's determination that the policy was also

void for O'Neill's misrepresentation of his prior loss history.  *See id.* at 853 n.5

("The district court found that only one misrepresentation is necessary . . . to void

the policy, and that therefore it need not consider the other three alleged

misrepresentations.  We agree." (citation omitted)).

## B.

BOA claims that the District Court erred in finding that BOA was not

covered under the terms of the insurance policy's standard mortgage clause.  BOA

also says that the District Court should not have reached this issue in the first place

because it was outside the scope of the pleadings and the pretrial stipulation.

In contrast to O'Neill's dispute, there is no judicially established federal

admiralty rule governing the formation and the interpretation of a standard

---

[11] At oral argument, counsel for O'Neill cited two cases—*Underwriters at Lloyd's v. Cole*, 959 F.2d 241 (9th Cir. 1992) (unpublished), and *Kilpatrick Marine Piling v. Fireman's Fund Ins. Co.*, 795 F.2d 940 (11th Cir. 1986)—for the proposition that courts have found misrepresentations of a vessel's purchase price immaterial.  But *Cole*, an unpublished opinion, antedates the Ninth Circuit's more recent treatment of materiality under the doctrine of *uberrimae fidei*.  *C'Est Moi, Inc.*, 519 F.3d at 939 ("The fact that the insurer has demanded answers to specific questions in an application for insurance is in itself usually sufficient to establish materiality as a matter of law." (quotation marks omitted)).  And *Kilpatrick* merely reaffirms that materiality is a question for the factfinder, one that is due deference on appeal. 795 F.2d at 943 ("Since we cannot say, as a matter of law, . . . that reasonable persons would not differ on the question whether the omitted facts were material, we decline to disregard the jury's finding.").  Counsel's reliance on those cases, therefore, is misplaced.

18

mortgage clause.  As such, we turn to state law.  *Wilburn Boat Co.*, 348 U.S. at 320–21, 75 S. Ct. at 370, 373–74.  The District Court concluded, and the parties do not currently dispute, that Pennsylvania law should guide our analysis.

1.

BOA believes that in considering the validity of the standard mortgage clause, the District Court permitted trial-by-ambush because that issue was outside the scope of the pleadings and the pretrial stipulation.  To be sure, we have held that "parties are bound by their stipulations and a pretrial stipulation frames the issues for trial."  *G.I.C. Corp. v. United States*, 121 F.3d 1447, 1450 (11th Cir. 1997).  But we have also cautioned that "[w]e are not inclined to disturb the district court's interpretation of a stipulation agreed upon by the parties during pretrial proceedings and approved by the court."  *Risher v. United States*, 465 F.2d 1, 5 (5th Cir. 1972);[12] *see also W. Peninsular Title Co. v. Palm Beach Cnty.*, 41 F.3d 1490, 1493 (11th Cir. 1995) (per curiam) ("[W]e owe great deference to the trial judge's interpretation and enforcement of pretrial stipulations.").

BOA's characterization of the proceedings below is simply unsupported by the record.  The pretrial stipulation agreed to by all of the parties raises the very

[12] In *Bonner v. City of Pritchard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit prior to October 1, 1981.  *Id.* at 1209.

question the District Court considered.  Under the heading "A Concise Statement of Issues of Law which remain for Determination by the Court," the parties framed the issue as follows: "Notwithstanding any alleged acts or omissions of O'Neill, or flaws in the *Bryemere*, whether [BOA] is nonetheless covered under the terms of the mortgagee clause."  So drafted, it is difficult to imagine how the pretrial stipulation could not have put BOA on notice that the extent of its rights under the standard mortgage clause was one of the subjects to be litigated at trial.  The District Court did not abuse its discretion in ruling on this issue.

2.

BOA goes on to argue that it can find refuge under the insurance policy's standard mortgage clause, O'Neill's misrepresentation aside.  The text of that clause reads:

> It is understood and agreed that in the interest of the Mortgagee(s) $1,976,000, shall not be impaired or invalidated by any act or omission, or neglect of the mortgagor, owner, master, agent or crew of the vessel(s) insured by this policy, or by failure to comply with any warranty or condition over what the Mortgagee has no control.

a.

We construe the terms of an insurance policy in accord with their plain meaning.  *E.g.*, *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982).  The clause at issue here purports to protect BOA's interest, as a mortgagee, in the loan on the *Bryemere*.  Pennsylvania law recognizes two types of mortgage clauses, both of

20

which safeguard a mortgagee's interest in the event of a loss, but which differ vastly in the level of protection they afford.

The first is an "open" or "simple" mortgage clause. A simple mortgage clause "places the mortgagee . . . in the shoes of the insured" such that the mortgagee "is simply a party appointed to receive the insurance proceeds to the extent of its interest, and its right to recovery is no greater than the right of the insured." *Cardwell v. Chrysler Fin. Corp.*, 804 A.2d 18, 24 (Pa. Super. Ct. 2002). As a result, the mortgagee "is subject to such defenses as the insurer may have against the mortgagor." *Id.* So when an insured-mortgagor's misconduct bars recovery under the policy, that misconduct will bar recovery by the mortgagee as well.

The second is a "union" or "standard" mortgage clause. A standard mortgage clause protects the mortgagee so that "the insurance [policy] shall not be invalidated by any act or neglect of the mortgagor or owner of the property." *Gallatin Fuels, Inc. v. Westchester Fire Ins. Co.*, 244 F. App'x 424, 429 (3d Cir. 2007) (unpublished) (quotation marks omitted) (applying Pennsylvania law). Unlike a simple mortgage clause, a standard mortgage clause "provides more coverage for the mortgagee . . . because the insurance policy expressly indicates that any act or neglect by the insured will not invalidate coverage." *Cardwell*, 804 A.2d at 24.

21

An examination of the policy's plain language makes abundantly clear that, under Pennsylvania law, the clause can be fairly characterized as a standard mortgage clause.  The clause explicitly and unambiguously protects BOA's interest in the loan on the *Bryemere* even if the underlying insurance policy is "impaired or invalidated by any act or omission, or neglect of the mortgagor."  *See Cardwell*, 804 A.2d at 24 ("If the clause contains such language as to indicate that coverage of the mortgagee . . .  will not be invalidated by the acts or omissions of the insured, it is a standard loss payable clause.").

Having identified a standard mortgage clause, we must determine what effect such a clause has, if any, on the relationship between BOA and AIG under the policy.  "Where a policy is issued to the owner and a [standard] mortgagee clause is attached, the [insurance] company is, in effect, making two contracts.  First, it is agreeing to indemnify the owner for the loss of the property and, second, it is insuring the creditor's security for his debt."  *Freystown Mut. Fire Ins. Co. v. Whited*, 41 Pa. D. & C. 605, 609 (Ct. Com. Pl. 1941).  This means that "a standard mortgagee clause . . . creates a separate, distinct and independent contract of insurance in favor of [the] mortgagee."  *Guarantee Trust & Safe Deposit Co. v. Home Mut. Fire Ins. Co.*, 117 A.2d 824, 825 (Pa. Super. Ct. 1955).

For this reason, a standard mortgage clause "is unaffected by the misrepresentations or false statements of the mortgagor."  4 Steven Plitt et al.,

22

Couch on Insurance 3d § 65:65 (2011).  And more still, "[a] standard mortgage clause has been held effective to protect the interest of the mortgagee even though the policy was itself void as to the mortgagor ab initio."  *Id.* § 65:50.

As a result, although O'Neill's misrepresentation rendered the policy void ab initio as to him, BOA's fate under the insurance policy does not necessarily rise or fall with the propriety of O'Neill's conduct.  To evaluate BOA's rights under the policy, then, we must look instead to basic principles governing the standard mortgage clause under Pennsylvania law.

b.

The District Court determined that the mortgage clause does not cover BOA under the insurance policy.  "We review conclusions of law made by a district judge following a bench trial *de novo*."  *Renteria-Marin v. Ag-Mart Produce, Inc.*, 537 F.3d 1321, 1324 (11th Cir. 2008).

The District Court properly regarded this case as sui generis.  That is because we are confronted with a scenario in which the named insured is neither the owner of the property insured by the policy nor the mortgagor on the loan for which the property serves as collateral.  In what appears to be a case of first impression, we must decide what rights—if any—BOA maintains amid these circumstances.

23

Were O'Neill the owner of the vessel and the mortgagor on the loan, our answer would be quite straightforward: under Pennsylvania law, BOA would, at the least, have the potential for coverage, O'Neill's misrepresentation notwithstanding. *See supra* part III.B.2.a. There is no dispute that O'Neill is the named insured. But O'Neill does not own the vessel—Carolina does. And O'Neill is not the mortgagor on the loan—Carolina is.

Yet the assumption undergirding the reasoning of the case law in this area is that "mortgagor" is synonymous with "named insured." *E.g.*, *Overholt v. Reliance Ins. Co.*, 179 A. 554, 556 (Pa. 1935) ("The so-called standard mortgage clause . . . creates in favor of the mortgagee a contract of insurance separate, distinct, and independent from that constituted between the *mortgagor* and *the insuring company* by the other provisions of the policy." (emphasis added)); *Willits v. Camden Fire Ins. Ass'n*, 189 A. 559, 561 (Pa. Super. Ct. 1937) (noting that a standard mortgage clause protects the mortgagee against conduct by "the *insured mortgagor* or owner" (emphasis added)); *see also, e.g.*, *Guarantee Trust & Safe Deposit Co. v. Home Mut. Fire Ins. Co.*, 117 A.2d 824 (Pa. Super. Ct. 1955) (discussing a standard mortgage clause on a policy where the named insured was also the mortgagor); *Abbottsford Bldg. & Loan Ass'n v. William Penn Fire Ins. Co.*, 197 A. 504 (Pa. Super Ct. 1938) (same); *Risha v. Farmers Fire Ins. Agency*, 56 Pa. D. & C.4th 194 (Ct. Com. Pl. 2001) (same); *Benchoff v. W. Mut. Fire Ins.*

24

*Co.*, 8 Pa. D. & C.2d 471 (Ct. Com. Pl. 1954) (same).  That assumption does not hold here.  Carolina, a corporate entity, is the mortgagor but—critically, in our view—is not the named insured on the policy.

The difference between O'Neill and Carolina is no mere technicality.  The corporate form matters: even though O'Neill is Carolina's sole shareholder, "the general rule is that a corporation shall be regarded as an independent entity even if its stock is owned entirely by one person." *Lumax Indus., Inc. v. Aultman*, 669 A.2d 893, 895 (Pa. 1995).  Moreover, "property of a limited liability company is owned by the company itself rather than nominally or otherwise by the members." 15 Pa. Cons. Stat. Ann. § 8923 cmt. 1994.

To be sure, Pennsylvania courts have long held that an insurance policy "is on the insured's interest in the property, not the property itself." *Mut. Benefit Ins. Co. v. Goschenhoppen Mut. Ins. Co.*, 572 A.2d 1275, 1277 (Pa. Super. Ct. 1990).  And we have no doubt that O'Neill possesses an insurable interest in the *Bryemere*, even if he does not hold legal title to the vessel.  *See Luchansky v. Farmers Fire Ins. Co.*, 515 A.2d 598, 599 (Pa. Super. Ct. 1986) ("The general rule is that anyone has an insurable interest who derives pecuniary benefit or advantage from the preservation or continued existence of the property or who will suffer pecuniary loss from its destruction.").  But that does not change the fact that the entire logic of the standard mortgage clause—protection for the mortgagee from acts or

25

omissions by the mortgagor—unravels when the mortgagor is not the named insured under the very policy purporting to insure the mortgagee's interest. *Cf.* 4 Steven Plitt et al., Couch on Insurance 3d § 65:8 (2011) (explaining that a standard mortgage clause protects the mortgagee "against loss from any act or neglect of the *mortgagor or owner* so that it shall not defeat the insurance so far as the interest of the mortgagee is concerned" (emphasis added)). Indeed, the District Court rightly noted that "the mortgagee's interest clause clearly relies on the presumption that the mortgagor is . . . the named insured . . . ."

So it bears emphasis that AIG and Carolina never entered into an insurance contract at all. O'Neill signed the mortgage in his capacity as managing member of Carolina; the insurance policy, by contrast, is in O'Neill's name alone. For this reason, the District Court made the factual determination that O'Neill acted on his own behalf—not on behalf of Carolina LLC—in procuring the insurance policy.[13]

The mortgage clause, moreover, was part and parcel of the deal BOA struck with Carolina, and BOA ran the risk that Carolina would err in how it obtained

---

[13] BOA argues that O'Neill acted as Carolina's agent in obtaining the policy. On this record, we are not left with the definite and firm conviction that the District Court's factual finding to the contrary is clearly erroneous. The District Court's determination is supported by the fact that the insurance application lacks any mention of Carolina or O'Neill's role as managing member of Carolina. More still, the insurance application stands in stark contrast to the mortgage, which O'Neill *did* sign in his capacity as Carolina's managing member. That Carolina had an obligation to obtain mortgagee insurance does not necessarily mean that O'Neill was acting on behalf of Carolina when he obtained the policy, much less establish that the District Court's finding constituted clear error.

26

coverage. BOA was in the best position to take care that the two parties central to the proper formation of a standard mortgage clause—the named insured and the mortgagor—aligned so as to protect its interest in the loan.[14] But they did not. Accordingly, BOA cannot rely on the independent contractual status ordinarily conferred upon the standard mortgage clause by Pennsylvania law.

To hold otherwise would render the plain language of the clause internally incoherent. By its terms, the clause protects BOA from five different actors whose conduct might impair or invalidate the insurance policy: the mortgagor, the owner, the master, an agent, or the crew of the *Bryemere*. In this case, O'Neill is the relevant actor, but the mortgage clause appears to afford BOA no protection from his behavior, which rendered the policy void ab initio. Carolina is the mortgagor and owner. The District Court found, and BOA does not contest, that the record contains no evidence to indicate that O'Neill acted as either the master or crew member of the vessel in obtaining the policy. For the clause's plain language to

---

[14] Consider the evidence indicating that BOA recognized this incongruity and requested a change in the insurance policy to remedy it. *See supra* part I.C.2. Indeed, BOA was likely aware that O'Neill and Carolina were separate entities, demonstrated by the fact that BOA, as a condition of Carolina's loan, required O'Neill to serve as guarantor. BOA's request for a change in the named insured was never communicated to AIG, who produced a final policy with O'Neill as the named insured and who did not learn about the existence of Carolina until years after the policy issued. All this suggests that BOA knew or had reason to know that O'Neill and Carolina were legally distinct and knew or had reason to know that AIG had made a mistake in drafting the policy as a result. But BOA appears to have never successfully alerted AIG to this critical error.

27

protect BOA from O'Neill's misrepresentation, we would have to reach the puzzling conclusion that O'Neill, in procuring the insurance policy, acted not to safeguard his own insurable interest, but rather as an "agent" of the *Bryemere*, a vessel that cannot be an "insured" in the first place. *E.g.*, *In re Gorman's Estate*, 184 A. 86, 87 (Pa. 1936) ("The [property] itself is not insured; the indemnity is provided for the insured and for his interest in the property.").[15]

In sum, an analysis of Pennsylvania law and the insurance policy's plain language reveals a fundamental assumption underlying the standard mortgage clause: that the mortgagor and the named insured are one and the same. This assumption was not satisfied here. As a result, the District Court correctly concluded that BOA is not covered under the policy.[16]

---

[15] Perhaps, under different circumstances, the appropriate remedy in a case such as this would have been for one of the litigants to ask the court to exercise its equitable discretion in order to reform the contract in accord with the intent of the parties. Restatement (Second) of Contracts § 155. We can only speculate, however, as to whether AIG would have issued the same insurance policy had it known the vessel was in fact owned by Carolina, not O'Neill. In fact, the evidence indicates that AIG may not have become aware that Carolina held title to the vessel until some two years after the issuance of the policy.

[16] The parties in this case have expended considerable energy in their briefs debating the District Court's factual findings and legal conclusions regarding communications exchanged between King, Foulds, Bonner, and two employees of Beacon, O'Neill's mortgage broker, prior to the issuance of the insurance policy. We have no reason to delve into this line of argument, because we affirm the District Court on a different ground: that both Pennsylvania law and the plain language of this policy's mortgage clause require the mortgagor to be the named insured. As the District Court explained, "the mortgagee's interest clause clearly relies on the presumption that the mortgagor is . . . the named insured . . . ."

28

IV.

For these reasons, we AFFIRM the judgment of the District Court.

DuBOSE, District Judge, concurring in the judgment:

I concur fully with the majority's opinion that O'Neill cannot recover under the AIG policy. As to BOA, I also agree with the majority's opinion that the District Court did not abuse its discretion in ruling on the validity of the mortgage clause.

I concur in the judgment only as to the determination that BOA cannot recover under the policy.   I would affirm based on the District Court's determination that in view of BOA's unique involvement with the procurement of insurance, no contract was formed in favor of BOA.  This is because BOA rejected the offer of insurance by requesting that the insured's name be changed from O'Neill to Carolina.

I write to take exception to two of the majority's determinations as it relates to BOA's claim. First, the majority determined that in order for a mortgage clause to be valid, Pennsylvania law requires that an owner or mortgagor be the named insured.  It is true that when discussing mortgage clauses, Pennsylvania courts have used the terms insured, mortgagor and owner interchangeably.  However, under the facts of the cited cases, the terms were interchangeable.  I do not agree that the interchangeable use of owner and insured in Pennsylvania law is a basis

30

for holding that an insured must be the owner or mortgagor of the collateral to have a valid mortgagee clause included in the policy.[1]

Second, the majority determined that the policy's plain language requires that the insured be the mortgagor/owner. The basis for this determination was because none of the five actors named in the mortgagee clause (from whose conduct the mortgagee is protected), was the named insured.[2] Thus, the majority concludes that the mortgagee clause would be rendered internally incoherent because the clause would not provide protection to the mortgagee from the acts of the insured.

I do not construe the mortgagee clause to require that the insured be the mortgagor/owner. It should be noted that the mortgage clause also provides that the mortgagee's interest is not invalidated "by failure to comply with any warranty or condition over what the Mortgagee has no control." (D.C. Doc. 478-1 at 23).

---

[1] There are conceivable instances, which have not been addressed in Pennsylvania law, where it would be appropriate for a non-owner of the collateral to seek protection for the mortgagee. Such an instance occurred in this case. The loan agreement with BOA was executed by O'Neill (individually) as a co-borrower. (D.C. Doc. 477-1 at 27-30). The duty to obtain property insurance on the vessel and to insure the interests of AIG was found in the loan agreement and applied to both O'Neill and Carolina. (*Id.* at 28 ("You or yours means each borrower…. You agree to have physical damage insurance … which covers both interests…")). Thus O'Neill, as a borrower, had a duty and a financial interest in securing insurance that protected the mortgagee's interest in the collateral.

[2] Although the District Court determined that O'Neill was an agent of the vessel, it was also determined that O'Neill was not acting as an agent when he procured the policy at issue.

31

This phrase is not modified by reference to specific actors, but certainly would include the insured.  Thus, if O'Neill failed to meet a condition of the policy over which the Mortgagee had no control, then the Mortgagee would be protected.[3]

---

[3] The "conditions" are defined to include the "AIG Private Client Group Yacht wording". (D.C. Doc. 478-1 at 23).  Looking to the policy, the general conditions are found at pages 18-21, and include that the policy is void if inaccurate or incomplete information is provided.  (478-1 at 20).

32