[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-12105

_____

D.C. Docket No. 8:16-cv-02329-JDW-MAP

GEICO MARINE INSURANCE COMPANY,

Plaintiff-Appellant,

versus

JAMES SHACKLEFORD,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(December 17, 2019)

Before WILLIAM PRYOR, MARTIN, and KATSAS,[*] Circuit Judges.

WILLIAM PRYOR, Circuit Judge:

---

[*] Honorable Gregory G. Katsas, United States Circuit Judge for the District of Columbia Circuit, sitting by designation.

This appeal requires us to decide whether damage to a yacht was covered under a marine insurance policy. Geico Marine Insurance Company insured James Shackleford's 65-foot sailboat, *Sea the World*. After a storm damaged the vessel in Florida, Geico Marine denied Shackleford's claim under the policy. Geico Marine then filed a declaratory-judgment action against Shackleford. As one ground for relief, Geico Marine sought a declaration that a navigational limit in the policy that required the vessel to be north of Cape Hatteras, North Carolina, during hurricane season barred coverage. After a bench trial, the district court ruled against Geico Marine and declared that the policy covered the loss. Because we agree with Geico Marine that the navigational limit bars coverage, we reverse and remand.

## I. BACKGROUND

Shackleford purchased the *Sea the World* in 2009. He paid about $120,000 for the vessel, and at one point he planned to sail her around the world. But those plans never came to pass.

In 2011, lightning struck the vessel. Shackleford took the vessel to Sailor's Wharf, a yacht yard in St. Petersburg, Florida, for repairs. But Sailor's Wharf only made matters worse. It improperly hauled the vessel from the water and improperly "blocked" the vessel while storing it on shore, which caused structural damage to the ship's hull.

Shackleford filed an insurance claim with Continental Insurance Company,

2

which insured the *Sea the World* then. In 2014, Continental declared the vessel a constructive total loss, settled Shackleford's claim, and canceled the policy. Continental also waived its subrogation rights and assigned its interest in any claim against Sailor's Wharf to Shackleford.

In 2015, Shackleford sued Sailor's Wharf for breach of its repair contract. *Shackleford v. Sailor's Wharf, Inc.*, No. 8:15-cv-00407-VMC-TBM (M.D. Fla. filed Feb. 26, 2015). As part of discovery in that litigation, Shackleford arranged to have the vessel hauled ashore for inspection by expert witnesses at Taylor Boatworks, a boatyard in Cortez on Florida's west coast. But before Taylor Boatworks would haul the vessel from the water, it required Shackleford to obtain liability insurance on the vessel.

In March 2016, Shackleford obtained a liability-only policy from Geico Marine, which insured several of his other watercraft. The policy did not insure the hull of the vessel against damage but did permit navigation. The General Conditions section provided the following terms of coverage:

> **Where Covered**
> Coverage is provided:
> A.    While the boat is afloat within the navigational area shown on the Declarations Page; and
> B.    While the boat or its equipment is ashore or being transported by land conveyance in the United States or Canada.

The accompanying declarations page, in turn, included the following navigational limit:

3

**CRUISING LIMITS: While afloat, the insured Yacht shall be confined to the waters indicated below:**
**(There is no coverage outside of this area without the Company's written permission.)**
U.S. Atlantic and Gulf Coastal waters and inland waters tributary thereto between Eastport, ME and Brownsville, TX, inclusive and the waters of the Bahamas including the Turks and Caicos, however the boat must be north of Cape Hatteras, NC from June 1 until November 1 annually.

The day after the policy issued, Shackleford asked Geico Marine to change the policy to "Port Risk Ashore." That restriction provides no coverage for navigation; instead, it provides coverage only while the vessel is out of the water. Geico Marine issued an endorsement and updated declarations page adding the restriction that same day. Because coverage now applied only if the vessel was ashore, the updated declarations page removed the original navigational limit that required the vessel to be north of Cape Hatteras during hurricane season if afloat.

With the Port Risk Ashore restriction in place, Taylor Boatworks hauled the vessel ashore so that Shackleford's expert marine surveyor could inspect her in connection with the Sailor's Wharf litigation. Following the inspection, Shackleford concluded that the damage to the vessel's hull was less severe than he originally believed and that the vessel was worth repairing. So he made plans to sail her from Taylor Boatworks on the west coast of Florida to Fort Lauderdale on the east coast, where she would undergo extensive repairs.

In May 2016, Shackleford called Geico Marine to seek removal of the Port

4

Risk Ashore restriction so he could sail the vessel to Fort Lauderdale. He also confirmed that the policy now insured the vessel's hull for $264,000 and that the vessel had "full coverage" for the voyage. On May 27, 2016, Geico Marine sent Shackleford an email confirming that it had removed the Port Risk Ashore restriction. Attached to the email was an endorsement removing the restriction and an updated declarations page. The updated declarations page reinstated the original navigational limit that required the vessel "[w]hile afloat" to be "north of Cape Hatteras, NC from June 1 until November 1 annually." Shackleford testified that he never requested or discussed such a navigational limit with Geico Marine and that he does not recall seeing the updated declarations page before departing for Fort Lauderdale.

On May 28, one day after Geico Marine removed the Port Risk Ashore restriction and reinstated the navigational limit, Shackleford set sail from Taylor Boatworks to Fort Lauderdale. After arriving in Fort Lauderdale, Shackleford anchored the vessel in nearby Lake Sylvia. In June 2016, a storm caused the vessel to drag anchor and drove her into a sea wall, leading her to take on water and suffer other damage. Shackleford filed a claim under his insurance policy, but Geico Marine denied coverage.

After denying coverage, Geico Marine filed a declaratory-judgment action against Shackleford, 28 U.S.C. § 2201, and invoked admiralty jurisdiction, *id.*

5

§ 1333. Geico Marine sought a declaration that the policy was void *ab initio* under the maritime doctrine of *uberrimae fidei*, or utmost good faith, because Shackleford failed to disclose material facts about the vessel when procuring insurance. And it sought a declaration that coverage was barred by the policy's navigational limit, which required the vessel to be north of Cape Hatteras, North Carolina, during hurricane season.

Following a bench trial, the district court ruled against Geico Marine on both counts and declared that the policy covered Shackleford's loss. As to *uberrimae fidei*, the district court ruled that the parties contracted out of the doctrine and that, even if the doctrine applied, Shackleford did not omit any material facts when procuring insurance. As to the navigational limit, it ruled that the policy did not contain a navigational limit at the time of the loss and that, if it did, Geico Marine implicitly waived the limit when it agreed that Shackleford could sail the vessel to Fort Lauderdale in late May. Geico Marine challenges both rulings.

## II. STANDARDS OF REVIEW

In an appeal from a judgment following a bench trial, we review the conclusions of law *de novo* and the factual findings for clear error. *U.S. Commodity Futures Trading Comm'n v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1322 (11th Cir. 2018). "Questions of contract interpretation are pure questions of law," so we review the interpretation of an insurance contract *de novo*. *Tims v. LGE*

6

*Cmty. Credit Union*, 935 F.3d 1228, 1237 (11th Cir. 2019).

### III. DISCUSSION

Marine insurance contracts qualify as maritime contracts, which fall within the admiralty jurisdiction of the federal courts and are governed by maritime law. *AIG Centennial Ins. Co. v. O'Neill*, 782 F.3d 1296, 1302 & n.6 (11th Cir. 2015) (citing U.S. Const. art. III, § 2, cl. 1 and 28 U.S.C. § 1333). Even so, "it does not follow that every term in every maritime contract can only be controlled by some federally defined admiralty rule." *Id.* at 1302 (alteration adopted) (quoting *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 313 (1955)). "In the absence of a 'judicially established federal admiralty rule,' we rely on state law when addressing questions of marine insurance." *Id.* (quoting *Wilburn Boat*, 348 U.S. at 314); *see also* Bryan A. Garner et al., *The Law of Judicial Precedent* § 69, at 570 (2016). The parties agree that Florida law fills any gaps here.

Geico Marine argues that the policy's navigational limit unambiguously conditioned coverage on the vessel being north of Cape Hatteras, North Carolina, from June 1 until November 1 annually if the vessel was afloat. Because Shackleford breached that limit and because maritime law requires absolute enforcement of express navigational limits, Geico Marine contends the navigational limit bars coverage.

Shackleford responds with three reasons why the navigational limit does not

bar coverage. First, he argues that the policy is ambiguous as to whether it contained a navigational limit at the time of the loss, and Florida law construes ambiguities in insurance contracts against the insurer. Second, he argues that Geico Marine implicitly waived its right to enforce the navigational limit when it agreed that he could sail the vessel to Fort Lauderdale in late May. And third, he argues that any breach of the navigational limit does not bar coverage because Florida law does not strictly enforce express warranties in marine insurance contracts.

We reject Shackleford's arguments and agree with Geico Marine that the navigational limit bars coverage. And because we agree with Geico Marine on this issue, we need not address its argument that Shackleford breached a duty of *uberrimae fidei*. The navigational limit is dispositive.

No established rule of maritime law governs whether a navigational limit is part of a marine insurance contract, so we apply Florida law to determine whether the policy contained a navigational limit. *AIG Centennial*, 782 F.3d at 1302. Under Florida law, we first look to the text of the policy and construe the policy "in accordance with [its] plain language." *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 165 (Fla. 2003). But "if the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and the other limiting coverage," the policy is ambiguous and we must construe it in favor of coverage. *Id.* (alterations adopted). That "a provision is complex and requires

8

analysis for application" does not "automatically" mean it is ambiguous. *Id.* Before concluding that a provision is ambiguous, we must "read [the] policy as a whole, endeavoring to give every provision its full meaning and operative effect." *Id.* at 166 (citation and internal quotation marks omitted).

Reading the policy as a whole, we readily conclude that it unambiguously contained a navigational limit when the loss occurred. The policy states that "[c]overage is provided . . . [w]hile the boat is afloat within the navigational area shown on the Declarations Page." And the updated declarations page that issued the day before Shackleford sailed for Fort Lauderdale includes the following provision:

> **CRUISING LIMITS: While afloat, the insured Yacht shall be confined to the waters indicated below:**
> **(There is no coverage outside of this area without the Company's written permission.)**
> U.S. Atlantic and Gulf Coastal waters and inland waters tributary thereto between Eastport, ME and Brownsville, TX, inclusive and the waters of the Bahamas including the Turks and Caicos, however the boat must be north of Cape Hatteras, NC from June 1 until November 1 annually.

Four textual clues lead us to conclude that the "cruising limits" section of the declarations page unambiguously describes the "navigational area" referenced in the policy. First, the policy states that the declarations page will contain a "navigational area." In the maritime context, the term "navigation" means "[t]he act of sailing vessels on water." *Navigation*, *Black's Law Dictionary* (11th ed.

9

2019). And the declarations page specifies the "area"—specifically, the "waters"—in which the vessel could be sailed. So the declarations page contains a "navigational area" within the ordinary meaning of that term. Second, the policy states that coverage applies "[w]hile the boat is afloat" within the navigational area on the declarations page, and the declarations page likewise explains that its navigational restrictions apply to the vessel "[w]hile afloat." Third, both the policy and the declarations page make clear that "coverage" is conditioned on the vessel remaining within the prescribed navigational area while afloat. And fourth, the "cruising limits" section of the declarations page serves no purpose if not to define the "navigational area" upon which the policy conditions coverage. We must not read the "cruising limits" section out of the policy. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 26, at 174 (2012) ("If possible, every word and every provision is to be given effect."); *Swire*, 845 So. 2d at 166 (courts must "endeavor[] to give every provision its full meaning and operative effect" (citation and internal quotation marks omitted)). No other interpretation of the policy would give effect to the "cruising limits" section of the declarations page.

The district court offered two reasons why the policy is ambiguous as to whether it contained a navigational limit at the time of the loss. One concerns a discrepancy between the policy and the declarations page, and the other concerns a

10

discrepancy between the declarations page and an endorsement to the policy. But neither reason is persuasive.

First, the district court suggested the policy is ambiguous because it refers to the "navigational area" shown on the declarations page, and the declarations page instead uses the term "cruising limits." But "navigational area" is not a defined term in the policy, so it carries its ordinary meaning. *See Arguelles v. Citizens Prop. Ins. Corp.*, 278 So. 3d 108, 111 (Fla. Dist. Ct. App. 2019). And as explained above, the cruising limits in the declarations page unmistakably identify a "navigational area" under the ordinary meaning of that term.

Second, the district court found ambiguity based on a perceived inconsistency between the endorsement and the declarations page that Geico Marine issued the day before Shackleford sailed for Fort Lauderdale. Unlike the declarations page, the endorsement contained a section titled "Navigation Area," which was left blank. The district court ruled that the blank "Navigation Area" section at the bottom of the endorsement was inconsistent with the "cruising limits" in the declarations page and that a reasonable interpretation of the blank "Navigation Area" section was that the policy contained no navigational limit. But the district court ignored the following language on the endorsement form: "Nothing herein contained shall vary, alter or extend any provision or condition of the Policy other than as stated *above*." The blank "Navigation Area" section of the

11

endorsement appeared *below* the preceding language, so it could not alter (or conflict with) any navigational limit the policy imposed.

The district court erred. The policy is not ambiguous about whether it contained a navigational limit when the loss occurred. The plain language of the policy contains a navigational limit. *See Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005) ("[I]nsurance contracts are interpreted according to the plain language of the policy except when a genuine inconsistency, uncertainty, or ambiguity in meaning remains after resort to the ordinary rules of construction." (citation and internal quotation marks omitted)).

The district court alternatively ruled that Geico Marine "implicitly waived" the navigational limit when it agreed that Shackleford could sail the vessel to Fort Lauderdale for repairs in late May. The district court found that Geico Marine knew on May 27 when it lifted the Port Risk Ashore restriction that the vessel "would be sailed to Fort Lauderdale within a few days for repairs." And it found that a navigational limit "was 'absolutely' not discussed" when Shackleford first inquired about removing the Port Risk Ashore restriction. Even accepting those factual findings, this ruling was legal error.

No established rule of maritime law governs the waiver of a navigational limit, so we apply Florida law to determine whether Geico Marine waived its right to enforce that provision. *AIG Centennial*, 782 F.3d at 1302. In Florida, implied

waiver of a contractual right requires "conduct which implies the voluntary and intentional relinquishment of a known right." *Raymond James Fin. Servs., Inc. v. Saldukas*, 896 So. 2d 707, 711 (Fla. 2005). Shackleford's theory of implied waiver appears to be that Geico Marine waived the navigational limit by agreeing to a course of conduct that it knew would make it impossible for Shackleford to comply with the requirement that his vessel be north of Cape Hatteras by June 1. We are unpersuaded.

Geico Marine's decision to lift the Port Risk Ashore restriction on May 27 knowing that Shackleford would soon sail the vessel to Fort Lauderdale for repairs does not imply waiver of its right to enforce the navigational limit. The navigational limit required the vessel to be north of Cape Hatteras by June 1 only if the vessel was "afloat." The policy provided coverage without regard to geography "[w]hile the boat . . . is ashore . . . in the United States or Canada." Geico Marine knew Shackleford was taking the vessel to Fort Lauderdale for "extensive repairs," and it could reasonably have expected that Shackleford would comply with the navigational limit by having the vessel hauled ashore for repairs in Fort Lauderdale by June 1. The only way Geico Marine's conduct could have suggested it intended to waive the navigational limit is if the voyage to Fort Lauderdale was impossible to complete by June 1. But Shackleford conceded at oral argument that the vessel arrived in Fort Lauderdale by June 1 and that he intended to haul the vessel ashore

13

upon arrival, which would have complied with the navigational limit. Oral Arg. Recording at 12:27–12:38, 18:23–18:30 (Dec. 3, 2019). That the vessel arrived in Fort Lauderdale by June 1 shows that it was possible to complete the voyage by June 1. So Geico Marine plainly did not agree to a course of conduct that it knew would make compliance with the navigational limit impossible. Nothing in this record supports the conclusion that Geico Marine voluntarily and intentionally relinquished its right to enforce the navigational limit. The district court erred in ruling otherwise.

Even if Geico Marine did not waive the navigational limit, Shackleford argues that his breach of the navigational limit does not bar coverage because Florida law does not strictly enforce express warranties in marine insurance contracts. As Shackleford acknowledges, federal maritime law requires "strict" or absolute enforcement of express navigational warranties. *Lexington Ins. Co. v. Cooke's Seafood*, 835 F.2d 1364, 1366 (11th Cir. 1988); *see also Strict*, *Black's Law Dictionary* (11th ed. 2019) ("Absolute; requiring no showing of fault."). And established federal maritime rules, like the rule requiring absolute enforcement of express navigational warranties, ordinarily control "even in the face of contrary state authority." *AIG Centennial*, 782 F.3d at 1303 (citation and internal quotation marks omitted). But Shackleford contends that he and Geico Marine contracted out of the federal maritime rule of enforcement and instead selected Florida's more

14

forgiving rule.

Shackleford argues that the parties contracted out of the federal maritime rule requiring absolute enforcement of express navigational warranties by including a "Conformity to Law" provision in their policy. The provision states: "Any terms of this policy that conflict with the laws of the state where this policy is issued are considered amended to conform to such laws." Although parties to a marine insurance policy are generally free to contract out of federal maritime law, *King v. Allstate Ins. Co.*, 906 F.2d 1537, 1540–42 (11th Cir. 1990), we are not persuaded that Shackleford and Geico Marine did so.

Shackleford's argument that this provision contracts out of the federal maritime rule has two premises. First, the federal rule of absolute enforcement, as a default rule of maritime law, was one of the "terms of this policy" to which the provision refers. Second, the federal rule of enforcement conflicts with Florida law because Florida allows a marine insurer to avoid coverage based on an insured's breach of warranty only if the breach "increased the hazard by any means within the control of the insured." Fla. Stat. § 627.409(2). Because the federal rule of enforcement, an implied term of the policy, conflicts with Florida's rule, Shackleford argues that this implied "term" must be amended to conform to Florida's more insured-friendly laws.

Shackleford's argument fails because its first premise is false. As used in the

15

policy, the phrase "terms of this policy" refers only to the policy's *express* terms, not terms implied by law. Florida gives words in an insurance contract their ordinary meaning, which requires reading the words in context. *Swire*, 845 So. 2d at 165–66. We do not doubt that as a matter of ordinary meaning the "terms" of a contract may include terms implied by law. *See Term*, *Black's Law Dictionary* (11th ed. 2019) (listing "implied term" as one kind of term). But here context makes clear that the phrase "terms of this policy" refers only to the policy's express terms.

The phrase "terms of this policy" appears in a provision titled "Conformity to Law," and as its name suggests, the provision operates to conform any illegal policy terms to Florida law. Provisions like this one exist to address conflicts between the contract the parties wrote and what the law requires. *See* 16 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 49:24, at 138 (4th ed. 2000) ("Many [insurance] policies have a provision, doubtless superfluous, that in the event of a conflict between the policy's terms and the requirements of a state's insurance law, the latter will control."). Because the provision exists to save the policy the parties *wrote* from invalidity under state law, the phrase "terms of this policy" refers only to the policy's express terms—those *written* by the parties.

Shackleford effectively asks us to transform the policy's *conformity-to*-law provision into a *choice-of*-law provision. By default, federal maritime law

16

displaces contrary state law when construing a marine insurance contract. *AIG Centennial*, 782 F.3d at 1302–03. Shackleford would have us read the conformity-to-law provision as reversing this default rule, so that state law displaces any contrary federal maritime rule. But the provision does no such thing. The parties could have included a choice-of-law provision selecting state law over federal law, but they did not. And we "may not rewrite [the parties'] contract[], add meaning that is not present, or otherwise reach results contrary to the intentions of the parties." *Taurus Holdings*, 913 So. 2d at 532 (citation and internal quotation marks omitted).

Because the parties did not contract out of maritime law, we must apply the federal rule requiring absolute enforcement of express navigational limits. Under that rule, "breach of [an] express [navigational] warranty by the insured releases the insurance company from liability even if compliance with the warranty would not have avoided the loss." *Lexington*, 835 F.2d at 1366. Here, the policy contained a navigational limit that conditioned coverage on the vessel being "north of Cape Hatteras, NC from June 1 until November 1 annually" if the vessel was "afloat." The vessel suffered damage while afloat during a storm in Florida in early June. Because the vessel was outside of the covered navigational area when the loss occurred, the policy does not cover the loss.

17

## IV. CONCLUSION

We **REVERSE** the judgment in favor of Shackleford and **REMAND** with

instructions for the district court to enter judgment in favor of Geico Marine.